The HIBERNIA BANK, a corporation, Plaintiff,

v.

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN & HELPERS OF AMERICA, an Unincorporated Association, et al., Defendants.

No. C–75–1809–CBR.

United States District Court, N. D. California.

March 26, 1976.

---

Moses Lasky, Donald D. Connors, Jr., George H. Link, James L. Meeder, Brobeck, Phleger & Harrison, George R. Bianchi, David I. Freed, Tobin & Tobin, San Francisco, Cal., for plaintiff.

Duane B. Beeson, John D. Fouts, Brundage, Beeson, Tayer & Kovach, San Francisco, Cal., for Joint Council of Teamsters No. 7, et al.

David I. Sandborg, Shand Stephens, Bronson, Bronson & McKinnon, San Francisco, Cal., for Ken Taylor, Jack R. Wheeler, Jim Kincaid, William Chapman and Bernard Zarry as Trustees of Bay Area Delivery Drivers Security Fund, and Robert P. Scheibach, individually.

Charles Voltz, Carter, Cook & Voltz, San Francisco, Cal., for John E. Sullivan, Olin Sohm, Alfred Vallejo, Alexander Karle, Mrs. Virginia C. Russell and Alex Koslan, individually and as Trustees of California Packing House Employees and Warehousemens Unions Welfare Plan.

Sidney Dickstein, Dickstein, Shapiro & Morin, Washington, D. C., Julius Reich, Reich, Adell & Crost, Los Angeles, Cal., for International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

Robert P. Gates, John Hancock, Hancock, Rothert & Bunshoft, San Francisco, Cal., for Alexander von Hafften, individually and as Trustee of California Teamsters Welfare Trust.

Harvey Hoffman, San Francisco, Cal., for Kenneth W. Carlson, individually.

Yaroslav Sochynsky, Phillip Diamond, Landels, Ripley & Diamond, San Francisco, Cal., for William L. Logue and Robert Billmire, individually and as Trustees of California Teamsters Miscellaneous Health and Welfare Fund.

William F. Terheyden, Harry Finkle, Littler, Mendelson & Fastiff, San Francisco, Cal., for George H. Rees, Don Hardie, Paul Rembert, M. L. Robbins and Don Louis individually and as Trustees of Frozen Food Industry Welfare Trust Fund; and John A. Scalone, individually and as Trustees of Teamsters Life Ins. Trust.

Michael J. McLaughlin, Edward Solomon, San Francisco, Cal., for Teamsters Local 856 and Rudy Tham.

William Irvin, Fred J. DiBernardo, McLaughlin & Irvin, Los Angeles, Cal., Patrick W. Jordan, McLaughlin & Irvin, San Francisco, Cal., for Larry A. Peifer, Richard E. Campodonico, Dale Alexander, George Homer, Ralph Torrisi, Robert Windsor, individually and as Trustees of Northern California Soft Drink Industry and Teamsters Health and Welfare Trust; and John W. Bacon, individually and as Trustee of California Teamsters Welfare Trust.

James Odle, Robert D. Raven, Morrison & Foerster, San Francisco, Cal., for Robert E. Hoppman, individually and as Trustee of Northern California Bakery Driver's Security Fund.

Susan A. Ogdie, Jonathan H. Sakol, McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., for Frank Saveria, Jr., Charles Buchwald and Kenneth Peterson, individually and as Trustees of Watsonville Food Industries Welfare Fund.

Michael A. Dunchen, John J. Vlahos, Hanson, Bridgett, Marcus & Jenkins, San Francisco, Cal., for Owen Bennett, individually.

## MEMORANDUM OF OPINION AND ORDER

RENFREW, District Judge.

In this case plaintiff Hibernia Bank ("Bank") has brought suit to recover damages for losses it allegedly suffered as a result of alleged misfeasances in the composition and administration of cer-

tain union trust funds.[1] Defendants include the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America ("Teamsters Union"), one of its local unions, two of its joint councils, numerous trustees of the union trust funds, and the trustees of the Teamsters Security Fund of Northern California, Inc. ("TSF"). In each of the five claims asserted, the Bank puts forward a separate theory of recovery[2] for a loss in excess of $700,000 which it allegedly incurred when TSF failed to repay overdrafts[3] of that amount in its commercial account with the Bank. TSF has subsequently entered into bankruptcy proceedings under Chapter XI of the Bankruptcy Act, 11 U.S.C. § 701 et seq., and is not presently a party to this action. The Bank also seeks punitive damages in the amount of $1,000,000 and injunctive and declaratory relief against defendants.

Two of the claims asserted by the Bank are based on alleged violations of federal statutes. The jurisdiction of this Court is alleged to exist pursuant to Section 302(e) of the Labor Management Relations Act, 29 U.S.C. § 186(e); Section 502(e)(1) of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1132(e)(1); and 28 U.S.C. § 1337.[4] To these federal claims the Bank seeks to append, by way of the doctrine of pendent jurisdiction, the three claims based exclusively on state law. The plethora of motions made by the multitude of defendants requires the Court to determine whether the two federal claims are sufficient to allow this case to proceed in federal court. The Court has concluded that the Bank lacks standing to sue under either of the federal statutes upon which it relies and that jurisdiction over the state claims is not justified.

A brief summary of the factual allegations of the amended complaint will suffice for the resolution of the motions before the Court. TSF is a nonprofit California corporation organized by certain officers of two joint councils of the Teamsters Union operating in Northern California. The articles of incorporation

---

1. This memorandum is based on the First Amended Complaint filed December 1, 1975. During the preparation of this memorandum, the Bank filed on March 11, 1976, a Motion for Leave to File a Second Amended Complaint. The Court has considered the proposed changes and has concluded that they do not affect the analysis of the Court as reflected in this memorandum. Because of the result reached in this Memorandum of Opinion, that motion will be denied without hearing.

2. The first claim alleges that TSF is structured and administered in violation of Section 302 of the Labor Management Relations Act, 29 U.S.C. § 186. The second claim alleges that defendants are fiduciaries under the provisions of Section 402 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1102, and that defendants have breached their fiduciary duties prescribed by Section 404 of ERISA, 29 U.S.C. § 1104. The third claim alleges a violation by defendants of their common law duties and responsibilities as trustees and fiduciaries. The fourth claim alleges that defendants made negligent and intentional misrepresentations which caused the overdraft in the TSF commercial account. Finally, the fifth claim asserts the banker's right to off-set debts due it from other accounts of the debtor.

3. Section 4401(1) of the California Commercial Code makes the following provision regarding overdrafts:

"As against its customer, a bank may charge against his account any item which is otherwise properly payable from that account even though the charge creates an overdraft and in such event recover or obtain refund of the amount of the overdraft." (Emphasis added.)

That an overdraft which is paid by a bank creates a debt on the part of the drawer to the bank is also made clear in the Comments to the Uniform Commercial Code, which provide in relevant part as follows: "[T]he draft itself authorizes the payment for the drawer's account and carries an implied promise to reimburse the drawee." Uniform Commercial Code § 4–401, Comment 1 (emphasis added).

4. 28 U.S.C. § 1337 provides as follows: "The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies." The two federal statutes under which the Bank attempts to sue contain their own jurisdictional provisions. In neither of its briefs does the Bank suggest that Section 1337 provides any independent ground of jurisdiction, thus rendering that citation surplusage.

of TSF provide that one of its purposes is to:

> "maintain and establish administrative offices for the collection of contributions, processing, handling and paying of claims for insurance benefits due individuals under the terms of trust agreements formulated pursuant to collective bargaining agreements between local unions of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, an unincorporated association, and any and all employers signatory to said contracts providing for such benefits."

The administrative services provided by TSF were subsequently utilized by the trustees of a number of union trust funds which had been established pursuant to collective bargaining agreements between certain local unions and the employers of the union members represented by the local unions.

TSF and the individual trusts maintained commercial accounts with the Bank. In addition, after 1969, each of the trusts maintained a savings account with the Bank. The gravamen of the amended complaint is that the Bank has lost or is in the process of losing in excess of $700,000, which is the amount by which the TSF commercial checking account was overdrawn at the time TSF applied for bankruptcy. TSF exercised certain control over the commercial and savings accounts of the individual trusts. The amended complaint alleges:

> "Sometime in 1969 Hibernia Bank was made, by letter of agreement, the agent of each of the defendant Trusts. As the agent of the defendant Trusts, Hibernia Bank was authorized (1) to receive employer payments to the defendant Trusts, (2) upon the direction of defendant Carlson [one of the three directors of TSF], to pay out of the commercial accounts of individual defendant Trusts 'applicable administrative fees' to TSF, and (3) as directed by Carlson, to make transfers from the savings accounts of the individual defendant Trusts to their respective commercial accounts."

## I

■■■ The first claim set forth in the amended complaint alleges one or more violations of Section 302 of the Labor Management Relations Act, 29 U.S.C. § 186. Subsections (a) and (b) of Section 302 make it unlawful for an employer to pay and for any representative of its employees to receive, any money passing from the former to the latter.[5] Subsection (c) provides eight exceptions to this general proscription, the fifth of which is for money paid to a welfare trust fund for the "sole and exclusive benefit of the employees of such employer, and their families and dependents." 29 U.S.C. § 186(c)(5). In order to qualify under Section 186(c)(5), a trust fund must meet certain statutory conditions. The Bank's claim for declaratory, injunctive, and monetary relief is based on the alleged failure of defendants to comply with those conditions.

The Bank's first claim is not a model of precise pleading, including as it does a wide array of factual allegations which are only loosely associated with the legal grounds on which recovery is sought. One putative "claim showing that the pleader is entitled to relief" is clear. Fed.R.Civ.P. 8. Because of the relationship between TSF and the trusts to which it provided administrative serv-

---

5. In *Arroyo v. United States*, 359 U.S. 419, 425–426, 79 S.Ct. 864, 868, 3 L.Ed.2d 915, 920 (1959), the Supreme Court held that the enactment of Section 302 was motivated by Congressional concern "with corruption of collective bargaining through bribery of employee representatives by employers, with extortion by employee representatives, and with the possible abuse by union officers of the power which they might achieve if welfare funds were left to their sole control." (Footnotes omitted.) *See also National Labor Relations Board v. United Brotherhood of Carpenters and Joiners of America, Local # 1913, AFL–CIO*, 531 F.2d 424 at 427 (9 Cir., 1976); *Roark v. Boyle*, 141 U.S.App.D.C. 390, 439 F.2d 497, 505 (1970).

ices, the Bank alleges that TSF was subject to the requirements of Section 302. One specific requirement of the statute is that "employees and employers [be] equally represented in the administration of such fund * * *." 29 U.S.C. § 186(c)(5)(B). The Bank alleges that the directors were drawn exclusively from union groups, and therefore TSF was not in compliance with the statute. The first claim also includes a number of allegations of breaches of fiduciary duty by the various defendants, although these are not specifically characterized in the complaint as violations of Section 302. However, in the Bank's briefs, the argument is made that these breaches constitute violations of the statutory requirement that Section 302 trusts be established and administered "for the sole and exclusive benefit of the employees of [the contributing] employer * * *." 29 U.S.C. § 186(c)(5).

The Bank's claim under Section 302 has been met by an avalanche of motions from the defendants raising a multitude of alleged defects in that claim. The objections raised in the defendants' briefs run the gamut of issues possible under Section 302, beginning with the Bank's standing to sue and extending to the substantive scope of the provision and the relief available under it. After careful study, the Court has concluded that the Bank has failed to clear the initial hurdle of establishing its standing to sue for a violation of Section 302, thus obviating the need for the Court to reach the other issues raised by defendants.

The law of standing is a welter of holdings in a variety of cases involving dramatically different factual settings and legal claims. Indeed, the frequency with which the Supreme Court has discussed the law of standing indicates the difficulty of the subject. As a result, generalizations are difficult, if not, as the Supreme Court has said, "largely worthless as such". *Data Processing Service v. Camp*, 397 U.S. 150, 151, 90 S.Ct. 827, 829, 25 L.Ed.2d 184, 187 (1970).

Eschewing generalizations, the Court begins with the specific situation now before it. The Bank seeks declaratory, injunctive and monetary relief based on injury which it allegedly suffered as a direct consequence of defendants' violation of a federal statute. In analyzing this situation, the Court has relied upon the most recent decision of the Supreme Court on the subject of standing, *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

In *Warth* the Supreme Court stated: "The actual or threatened injury required by [the 'case and controversy' requirement of] Art. III may exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing . . . .'" *Id.* at 500, 95 S.Ct. at 2206, 45 L.Ed.2d at 355, *quoting Linda R. S. v. Richard D.*, 410 U.S. 614, 617 n. 3, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536, 540 (1973).

The question of standing to sue under Section 302 cannot be so easily resolved. The statute provides for both criminal and civil enforcement, 29 U.S.C. § 186(d) and (e), but the question of standing to invoke the civil enforcement powers of the federal courts is not specifically addressed. Section 302 simply provides:

"The district courts of the United States * * * shall have jurisdiction, for cause shown, * * * to restrain violations of this section * * *." 29 U.S.C. § 186(e).

Without any explicit statutory provision regarding standing, the Court is thrown back on an analysis of the purposes of the statute and the established principles of standing. As stated by the Supreme Court in *Warth*, the question to be resolved is "whether the * * * statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." 422 U.S. at 500, 95 S.Ct. at 2206, 45 L.Ed.2d at 355 (footnote omitted). Several years earlier in *Data Processing Service v. Camp, supra*, 397 U.S. at 153, 90 S.Ct. at 830, 25 L.Ed.2d at 188, the Court phrased

the question as "whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute * * * in question."

Despite an abundance of case law interpreting other aspects of Section 302, there is a paucity of authority on the question of standing to sue under it. The only Court of Appeals decision cited by the parties which directly addresses the issue of standing is *Employing Plasterers' Ass'n v. Journeymen, Etc.*, 279 F.2d 92 (7 Cir. 1960), a case cited by the Bank but which, in the Court's opinion, favors defendants. In that case the Court of Appeals for the Seventh Circuit held that the Employing Plasterers' Association of Chicago ("Association"), a nonprofit trade corporation representing 45 out of approximately 200 Chicago plastering contractors, had standing to sue under Section 302. The Association negotiated and executed collective bargaining agreements on behalf of its members, and it had negotiated the collective bargaining agreement which had established the plan of employer contributions at issue in the case. Furthermore, under that plan, the Association was responsible for the assessment, collection, and contribution from its members of their contributions, calculated as a certain number of cents per hour per man employed. *Id.* at 94. Responding to the defendants' challenge to the standing of the Association to sue under Section 302, the court stated that:

> "The right to test the legality of employer contributions assumed under a collective bargaining agreement is within the rights prescribed by the Act. It is available to employees and employers, *as well as to such other parties as may be directly concerned with the payment, acceptance, and administration of welfare funds.* Section 302(e) confers jurisdiction on the district court to entertain such a cause of action at the instance of the Association *on behalf* of its contractor-contributor members." *Id.* at 99 (emphasis added).

In the instant case, the involvement of the Bank "with the payment, acceptance, and administration of welfare funds" was notably indirect in comparison to that of the Association in *Employing Plasterers'.* The Bank's involvement scarcely extended beyond the provision of normal banking services that it provides to a wide variety of customers.[6] Apart from this obvious distinction, there is language in the *Employing Plasterers'* decision which tends to refute the Bank's contention that it would have standing under the Seventh Circuit's interpretation of the statute.

---

6. The following "letter agreement" defined the commercial relationship between the Bank and the individual trusts:

"You [the Bank] are hereby appointed our agent for the purpose of performing the following services:

"1. To receive the employer remittance forms and payments.

"2. To deposit all employer payments to a daily interest savings account on the day received.

"3. To process all information on the remittance forms and supply us with daily accountings.

"4. To pay by trust cashiers check, monthly upon the direction of Mr. Kenneth W. Carlson, the applicable insurance premium.

"5. To pay by trust cashiers check, to the Teamsters [Security] Fund of Northern California, monthly upon the direction of Mr. Kenneth W. Carlson, the applicable administrative fees.

"6. From time to time, to make transfers from the trust savings account to our commercial account as directed by Mr. Kenneth W. Carlson.

"7. To render from time to time detailed statements of the trust account.

"This agreement shall remain in effect until terminated either by you or by us by written notice mailed to the other at our last known addresses, respectively. If this agreement is terminated by such notice, you shall be reimbursed and held harmless for any loss suffered from any action taken in good faith prior to receipt by you of actual knowledge of termination.

"You shall receive for your services a reasonable annual fee, said fee to be mutually agreed upon."

Defendants in that case had raised the equitable defense of unclean hands, basing the defense on plaintiff's participation in the establishment and administration of the challenged trusts. The court rejected the defense, primarily for the following policy reason, which, incidentally, sheds considerable light on the intended scope of the court's holding on the question of standing:

> "To hold otherwise [with regard to the asserted defense of unclean hands] would, in effect, severely limit the availability of the injunctive remedy. *Any party having a right to sue thereunder* would almost certainly have participated in the alleged violations of Section 302—*employers* by the making of outlawed payments, *unions* by outlawed acceptance thereof by employees' 'representatives,' *employees* by receipt of benefits illegally disbursed, and *trustees* by sharing in the maladministration of the funds." *Id.* at 99 (emphasis added).

This apparently exhaustive enumeration of the basic categories of potential plaintiffs who have standing to sue under the statute cannot be stretched to include a plaintiff in the position of the Bank.[7]

Although Congress' silence on the question of standing under Section 302 requires the Court to proceed by implication, there is no reason to suppose that there was any intention to extend standing to an entity in the Bank's position. The extension of standing to such a party is not necessary to the effectuation of the purposes of the statute. The statute deals primarily with employers and their employees—parties who naturally adopt a somewhat adversarial posture in their dealings. The statute furthermore contemplates the participation in the administration of the trusts of neutral trustees. All of these parties and their representative organizations have, in addition to their own self-interest, the fear of possible criminal sanctions under Section 302 to encourage compliance with the statutory provisions. There is no reason to suppose that by extending standing to the Bank in this case, there would be any impetus toward a subsidiary enforcement role for other banks providing banking services to other Section 302 trusts.[8] Yet, that is the only

---

7. Certain language drawn from the court's rejection of this defense has provided one of the Bank's arguments in favor of its standing in the instant case. Although the argument is ingenious, it is without merit. The Court of Appeals for the Seventh Circuit recognized the potentially conflicting legal duties facing the Association: one arising from the collective bargaining agreement to which it was a party, and the other arising from Section 302 itself. In that context, standing to sue had particular importance to the Association, as the following quotation indicates:

> "Unilateral termination by the employer-contributors of allegedly illegal contractual obligations may subject them to an action for breach of the collective bargaining agreement. The benefit conferred upon the Association by a test of the legality of the welfare funds and a restraint of violations of Section 302 *is the bestowing of legal posture on payments and on the administration of welfare funds and the removal of the onus of participation in a continuing violation which may subject the Association to possible criminal sanctions.*" 279 F.2d at 99 (emphasis added).

The Bank attempts to convert the court's language concerning "the onus of participation" into an independent basis of standing, arguing that it faces the same kind of dilemma as that faced by the Association. The court was clearly not attempting to establish a separate test for standing under Section 302, but even if it were, the Bank would lack standing. Whatever onus the Bank may suffer by virtue of its limited participation, it is not the onus of a criminal sanction under the statute. No authority has been cited for the unlikely proposition that a bank that performs normal banking services for an improperly constituted union trust fund would be subject to the criminal sanctions of Section 302. Although this is the logical conclusion of the Bank's argument, the Bank has, not surprisingly, stopped short of expounding such ultimate liability.

8. Although it is certainly not determinative, the Court must note the transparency of the Bank's concern with the alleged violations of Section 302. The Bank seeks a method of attaining a federal forum for its effort to recover its lost $700,000. The Bank evidenced no concern over the now alleged violations of Section 302 before TSF failed to repay its overdraft. In its prayer for relief in the amended complaint, the Bank seeks not only to recover the more than $700,000 lost when

486

substantial policy argument in favor of extending standing to the Bank. Certainly, one must agree with defendants that Congress did not intend this statute to serve as a rather far-fetched way of extending federal jurisdiction over essentially state matters, such as the recovery of a debt.

In answer to these objections, the Bank places its primary reliance on language from the Supreme Court's decision in *Flast v. Cohen*, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), a case which explored the standing of federal taxpayers to challenge congressional appropriation of funds. In *Flast* the Court stated that:

> "it is both appropriate and necessary to look to the substantive issues * * * to determine *whether there is a logical nexus between the status asserted [by the plaintiff] and the claim sought to be adjudicated.*" *Id.* at 102, 88 S.Ct. at 1953, 20 L.Ed.2d at 963. (emphasis added).

The status claimed by the Bank is that of "agent" of the defendant trusts, although that agency relationship only extended to performing customary banking services. The nexus between the Bank's status and the violations alleged in the amended complaint is stated by the Bank in its briefs as follows:

> "But for the violations of Section 302 and the failures of the defendant directors and officers of TSF and the defendant trustees of the defendant trusts to meet their Section 302 obligations, plaintiff Hibernia Bank would not have been confronted with a loss in excess of $700,000."

TSF failed to repay its overdraft, but also declaratory and injunctive relief associated with the alleged violation of Section 302. Consequently, the Court cannot deny standing to the Bank for the reason offered by a number of defendants, namely, that Section 302 was never intended to serve as a method of disappointed creditors recovering money lost. That analysis addresses the issue of the appropriate relief available in the event that a violation is found, and not the issue of standing. The Court does, however, note that the claims for declaratory and injunctive relief from the al-

The Bank's reliance on *Flast* is misplaced for several reasons. First, the language quoted above from the more recent decisions in *Warth* and *Data Processing* speaks more directly to the proper analysis of standing under a statutory provision such as Section 302 and is, therefore, a better guide to decision. However, even when the *Flast* test is applied, the Bank's argument fails, because it concentrates excessively on the "nexus" and consequently fails to focus sufficiently on the necessary "status". Not everyone who can allege a causal connection between a statutory violation and a loss suffered by them is entitled to sue under the statute, and, for the reasons stated above, the Court does not feel that the Bank possesses the necessary status to sue under Section 302.

Moreover, the allegations of the complaint are inadequate to establish the "personal stake" necessary for the Bank to have standing. *Warth v. Seldin, supra*, 422 U.S. at 498–499, 95 S.Ct. at 2205, 45 L.Ed.2d at 354, *quoting Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663, 677 (1962). The *Warth* decision is especially instructive for the evaluation of a putative nexus such as that claimed by the Bank. In *Warth* several categories of plaintiffs sought to challenge an allegedly unconstitutional zoning ordinance adopted and enforced by the City of Penfield, New York. For several classes of plaintiffs, the question of standing hinged on the alleged nexus—to use the language of *Flast*—between the violation and their injury. As a preliminary matter, the Court emphasized that:

> "For purposes of ruling on a motion to dismiss for want of standing, both the

leged violations of Section 302 appear only in the amended complaint. With the exception of a prayer for a preliminary injunction against unspecified behavior, the original complaint asked specifically only for monetary relief. However, in ruling on these motions, the Court has carefully separated the many difficult questions going to the merits of the Bank's claims from the questions going to its standing. *See, e. g., Data Processing Service v. Camp, supra*, 397 U.S. at 158, 90 S.Ct. at 191, 25 L.Ed.2d at 832.

trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Id.* 422 U.S. at 501, 95 S.Ct. at 2206, 45 L.Ed.2d at 356.

For purposes of resolving the issue of standing, the Supreme Court assumed that "Penfield's zoning ordinance and the pattern of enforcement by respondent officials have had the purpose and effect of excluding persons of low and moderate income, many of whom are members of racial or ethnic minority groups", and that "such intentional exclusionary practices, if proved in a proper case, would be adjudged violative of the constitutional and statutory rights of the persons excluded." *Id.* at 502, 95 S.Ct. at 2207, 45 L.Ed.2d at 357. The Court then turned to an analysis of the standing of the plaintiffs in the category of "persons of low and moderate income" who had each asserted that "he made some effort, at some time, to locate housing in Penfield that was at once within his means and adequate for his family's needs. Each claim[ed] that his efforts proved fruitless." *Id.* at 503, 95 S.Ct. at 2207, 45 L.Ed.2d at 357. (footnote omitted). Despite the liberality of its assumptions, the Court held that plaintiffs had not demonstrated their standing because of their failure to

"allege facts from which it reasonably could be inferred that, absent the respondents' restrictive zoning practices, there is a substantial probability that they would have been able to purchase or lease in Penfield and that, if the court affords the relief requested, the asserted inability of petitioners will be removed." *Id.* at 504, 95 S.Ct. at 2208, 45 L.Ed.2d at 358.

Furthermore, and especially significant in this case, the fact that such allegations are made may not be sufficient. Another class of plaintiffs in *Warth* had claimed standing to sue as taxpayers of the nearby city of Rochester, New York. Their rather imaginative theory was that the restrictive zoning ordinance in Penfield had eliminated low and moderate income families from Penfield and had thrust the burden of providing housing for them on Rochester, thus causing Rochester to build more low and moderate income housing, requiring more tax abatements, and thereby throwing a greater burden on the taxpayers of Rochester. Notwithstanding these allegations, the Court held that the taxpayers lacked standing:

"'Of course, pleadings must be something more than an ingenious academic exercise in the conceivable.' *United States v. SCRAP*, 412 U.S. 669, 688, 93 S.Ct. 2405, 2416, 37 L.Ed.2d 254 (1973). We think the complaint of the taxpayer-petitioners is little more than such an exercise. Apart from the conjectural nature of the asserted injury, the line of causation between Penfield's actions and such injury is not apparent from the complaint. Whatever may occur in Penfield, the injury complained of—increases in taxation—results only from decisions made by the appropriate Rochester authorities, who are not parties to this case." *Id.* at 509, 95 S.Ct. at 2210, 45 L.Ed.2d at 360.

Applying the same type of analysis applied in *Warth* to the instant case, the Court concludes that the . Bank lacks standing to sue for a violation of Section 302. A careful reading of the amended complaint reveals no allegation of a causal connection between the alleged structural violation of Section 302 and the loss suffered by the Bank. The amended complaint does contain an allegation regarding the nexus between another alleged violation of Section 302 and the loss by the Bank:

"TSF's [collective bargaining] agreement with Local 856 permitted rampant feather-bedding, thereby causing the costs of administration of the defendant Trusts to escalate beyond all reason, and ultimately resulting in TSF's bankruptcy and an overdraft at Hibernia Bank in TSF's commercial account in excess of $700,000; * * *. This overdraft was directly caused by TSF in its administration of the defendant Trusts."

Presumably, the same argument would apply to the other alleged breaches of fiduciary duty set out in the first claim which focused on the inefficiency and maladministration of the trustees, but the argument is left to inference.

The amended complaint makes it clear that the loss suffered by the Bank resulted from an accumulated overdraft in the account of TSF which was not repaid. While the alleged violations of fiduciary duty may have increased the costs of administering the trusts, the relationship between those violations and the honoring of the overdraft by the Bank is not addressed at all. Even when all the allegations of the amended complaint are considered, it appears that the Bank had it within its power at all times to avoid the losses of which it complains simply by refusing to honor the overdraft. The only possible exception which appears in the amended complaint is the allegation of fraud, but that is a state claim and not a part of the alleged Section 302 violations. In this case, the Court is convinced that there have not been the necessary factual allegations to establish that the Bank has standing under Section 302.[9]

## II

The second claim of the amended complaint is based upon an alleged violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq. Based upon the same factual allegations as the first claim, this claim is that the actions taken by the defendants constituted violations of their fiduciary duties under Section 404 of ERISA, 29 U.S.C. § 1104. For these alleged violations, the Bank attempts to recover damages in the amount of its loss of the unpaid overdraft and attorneys' fees. Jurisdiction is alleged to exist under Section 502(e)(2) of ERISA, 29 U.S.C. § 1132(e)(2). The Court assumes that there is a typographical error in the jurisdictional allegation and that the intended citation was Section 502(e)(1), rather than Section 502(e)(2), which is concerned with the proper venue of a civil action.

Defendants have argued that the Bank has no standing to sue for an alleged violation of ERISA. The analysis of this argument is somewhat more straightforward than that of standing under Section 302, because ERISA specifically states those categories of potential plaintiffs which have standing to sue under it. Section 502(a) of ERISA, 29 U.S.C. § 1132(a), defines those categories of persons who may bring various civil enforcement actions under the Act. Some categories of persons are empowered to bring one type of enforcement action but not another; however, when all types of enforcement actions are considered, only four categories of persons are empowered to bring a civil action under the Act. They include (1) the Secretary of Labor, (2) "participants" in ERISA trusts, (3) "beneficiaries" of ERISA trusts, or (4) "fiduciaries" of ERISA trusts. The Bank claims the right to sue both as a beneficiary and as a fiduciary,

9. As inferential support for its claim of standing under Section 302, the Bank cites the case of *Philadelphia National Bank v. Employing Bricklayers' Association of Philadelphia*, 169 F.Supp. 591 (E.D.Pa.1959), a case involving a dispute over the proper composition of the board of trustees of a welfare fund established under Section 302. The matter was brought before the District Court by way of a "petition in the nature of an equitable interpleader by the Philadelphia National Bank". *Id.* at 593.

"The Bank wants to know who may give orders respecting the securities it holds as custodian and who may draw on the funds on deposit with it by the Welfare Fund * * *." *Id.* at 593.

The court did, however, state that it had jurisdiction under Section 302 "to restrain disbursements of moneys of the Welfare Fund by unauthorized persons." *Id.* at 594. The question of standing on the part of the Philadelphia National Bank to sue under Section 302 was not discussed by the court, presumably because it was not challenged. The failure of the court in *Philadelphia National Bank* to discuss the question of standing eliminates most of the precedential value of the case for the issue now before the Court. Moreover, the fact that case was brought "in the nature of an equitable interpleader" sufficiently distinguishes it from the instant case.

as defined by the statute. Although the Bank's position is resourceful, it is also unavailing.

Section 3(8), 29 U.S.C. § 1002(8), defines a "beneficiary" as "a person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder." [10] The Bank's amended complaint simply asserts its status as a beneficiary, an assertion that is amplified only slightly in the Bank's briefs, where the following argument is made:

"The benfit [sic] to which it is entitled is not a pension payment, or recompense for hospitalization charges, but it *is* a benefit payable from the corpus of the trust; payment of costs of administration is indeed specified in the trust instruments."

Although the word "benefit" is not specifically defined by the Act, the Court is convinced that Congress did not intend to include an entity such as the Bank in the category of "beneficiaries". This conviction is supported by the definitions of "employee welfare benefit plan" and "welfare plan" in Section 3(1) of the Act, 29 U.S.C. § 1002(1). The benefits to which a beneficiary must be entitled are, in general, "fringe benefits" such as medical disability and vacation payments.

The Bank's second argument is that it is entitled to sue because of its status as a "fiduciary", as defined by the statute. Section 3(21)(A) of the Act, 29 U.S.C. § 1002(21)(A) provides:

"Except as otherwise provided in subparagraph (B), a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan. Such term includes any person designated under section 1105(c)(1)(B) of this title."

The allegation in the complaint of the Bank's fiduciary status is purely conclusory. Here, however, even the briefs are not especially illuminating as to the Bank's argument. The Bank's original brief in opposition to the defendants' motions simply stated that "[The Bank] is a·fiduciary under the plain language of the statute; Act, § 3(21)(A) and 38(A) & (B), 29 U.S.C. § 1002(21)(A)." In the supplemental brief, the Bank relied upon "the facts alleged in the complaint concerning Hibernia Bank's relationship with the defendant fiduciaries, and * * the plain language of the statute * * * ." Only in responding to the arguments made by defendants did the Bank clearly state its position. The Bank argues, first, that it is a fiduciary because it has the requisite "discretionary authority [and] discretionary control responsibility respecting management of such plan * * * ." 29 U.S.C. § 1002(21)(A). The Bank also claims fiduciary status because of its agency relationship with the defendant trustees, who are ERISA fiduciaries. The final argument is that ERISA gives fiduciary status to custodians of employee benefit plans, and that the Bank is such a custodian.

The Bank's first two arguments rely upon the "agency" relationship which exists between the Bank and the individual trusts because of the "letter agreement" reached between them.[11] The Court has examined this agreement and has con-

---

**10.** Section 3(7) of ERISA, 29 U.S.C. § 1002(7), defines "participant" as "any employee or former employee of an employer, or any member or former member of an employee organization, who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer or members of such organization, or whose beneficiaries may be eligible to receive any such benefit."

**11.** See note 6, *supra*.

cluded that it simply will not support the Bank's arguments. The letter agreement sets forth seven precise duties of the Bank; no other duties are specified therein or even suggested. Items 1, 2, 3 and 7 refer to the simple maintenance of an account and the preparation of records associated therewith. Items 4, 5 and 6 refer to the payment and expenditure of moneys, but each item expressly provides that such payments and expenditures are to be made only at the direction of defendant Carlson. The Court is unable to find any evidence of the "discretionary authority and responsibility" asserted by the Bank and required by the statute.

The Bank's final argument is that under Section 3(14), 29 U.S.C. § 1002(14), a "custodian" of an employee benefit plan is a "fiduciary". Section 3(14) defines the phrase "party in interest" and provides in pertinent part:

"The term 'party in interest' means, as to an employee benefit plan—

"(A) any fiduciary (including, but not limited to, any administrator, officer, trustee, or custodian), counselor, or employee of such employee benefit plan;"

Obviously, a custodian *can* be a fiduciary, but only if it possesses the requisite discretionary authority and discretionary control required by Section 3(21) of ERISA. Section 3(14) in no way enlarges the definition of a fiduciary set forth in Section 3(21); it merely mentions several of the categories which might be so characterized. The Court also notes that this interpretation is consistent with an Interpretive Release, 40 Fed.Reg. 47491 (1975), regarding the definition of a fiduciary under ERISA issued by the Department of Labor on October 3, 1975.

Therein the Department states that an entity which has "no power to make any decisions as to plan policy, interpretations, practices or procedures" and which serves such plan only for the "[c]ollection of contributions and application of contributions as provided in the plan" is *not* a fiduciary.

Accordingly, the Court concludes that the Bank is neither a fiduciary nor a beneficiary under the express provisions of ERISA and thus has no standing to bring suit under that Act.

### III

■ Because of the Court's conclusion that the Bank lacks standing to sue under either of the federal statutes under which relief has been sought, judicial economy would not be served by the exercise of pendent jurisdiction over the state claims.[12] *See United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218, 228 (1966). Because those claims are properly to be litigated in the state courts, they are hereby dismissed.

Accordingly,

IT IS HEREBY ORDERED that defendants' motions to dismiss the complaint for failure to state a claim are granted and the complaint and action herein are dismissed.

IT IS HEREBY FURTHER ORDERED that counsel for defendants shall prepare an appropriate form of judgment in accordance with this Memorandum of Opinion and Order.

IT IS HEREBY FURTHER ORDERED that the Bank's Motion for Leave to File a Second Amended Complaint is denied without hearing.

12. Those three claims are described in note 2, *supra.*