Loran W. ROBBINS, Robert E. Schlieve, Marion M. Winstead, Harold J. Yates, Earl L. Jennings, Jr., Robert J. Baker, Howard McDougall, Thomas F. O'Malley, and R. V. Pulliam, Sr., as Trustees of Central States, Southeast and Southwest Areas Pension Fund, Plaintiffs,

v.

FIRST AMERICAN BANK OF VIRGINIA, a corporation, Moorefield Enterprises, a Virginia limited partnership, DeLuca Enterprises, Inc., a corporation, DeLuca Construction Corporation, a corporation, Marc E. Bettius, John F. DeLuca, Marilyn M. DeLuca and Donald D. McDonald, Defendants.

No. 79 C 2147.

United States District Court, N. D. Illinois, E. D.

May 21, 1981.

James L. Coghlan, William J. Nellis, David J. Magee, Coghlan, Joyce & Nellis, Chicago, Ill., for plaintiffs.

Roger L. Taylor, Laurence P. Bemis, Emily Nicklin, Kirkland & Ellis, Chicago, Ill., for First American Bank of Virginia.

Robert S. Bailey, Jeffrey Lawrence, Chicago, Ill., for other defendants.

## MEMORANDUM AND ORDER

MORAN, District Judge.

This is an action by trustees of various teamster pension funds against First American Bank of Virginia, Moorefield Enterprises, DeLuca Enterprises and several individuals arising out of plaintiffs' purchase of a participation interest in a loan extended by the bank to Moorefield Enterprises. The eight-count complaint alleges claims based upon the federal securities laws, 15 U.S.C. § 78j(b); 15 U.S.C. § 77q(a); upon ERISA, 29 U.S.C. § 1109; and upon state law contract and tort theories. The defendants have most recently filed a motion to dismiss the amended federal law claims for lack of subject matter jurisdiction and for improper venue. Prior motions to dismiss the state law claims for lack of personal jurisdiction and venue are also pending.

During May, 1974 defendant Moorefield entered into a Credit Agreement with the Arlington Trust Bank (now First American Bank of Virginia) wherein the bank agreed to loan $18,000,000 to Moorefield to acquire and develop land for commercial and residential use. Each party's performance under the Credit Agreement was expressly conditioned upon participation by the trustees of the teamster pension fund. The trustees agreed to loan 90 percent of the total loan proceeds ($16,200,000) with the bank offering 10 percent. The trustees and bank signed a loan participation agreement which was approved and became legally effective on May 29, 1974.

To secure the sums advanced under the Credit Agreement, Moorefield gave the bank an $18,000,000 note on May 31, 1974. The terms of the note specified that the loan would mature and be payable no later than three years from its date of issuance. The interest on the loan was set at 3½ percent in excess of the prime rate charged by the Chase Manhattan Bank and the note was secured by a properly recorded Deed of Trust on 95 acres of land in Virginia.

The loan participation agreement between the bank and trustees specified that the plaintiffs agreed to purchase 90 percent of each advance from the bank to Moorefield. In turn, the bank held an interest in the Credit Agreement, Note and Deed of Trust for the plaintiffs. The plaintiffs' written consent was required before the bank could either modify, terminate or take any other action with regard to the loan. The bank was obligated to notify the plaintiffs of matters which affected their interests in the transaction as well as to "endeavor to use the same care that it would exercise in the making and handling of loans for its own account."

The parties in the action include the plaintiffs who entered into the participation agreement with the defendant bank. The bank, in turn, entered into the Credit Agreement with defendant Moorefield Enterprises, a Virginia limited partnership. DeLuca Enterprises is a general partner of Moorefield and Marc E. Bettius is a limited partner of Moorefield. John F. DeLuca is President of DeLuca Enterprises and DeLuca Construction Corporation. Marilyn M. DeLuca is Secretary of DeLuca Enterprises. Donald McDonald is Assistant Secretary of DeLuca Enterprises. The bank is represented by one set of counsel; all of the "other defendants", with the exception of Marilyn M. DeLuca, are represented by another.

All of the counts of the complaint arise from the same set of operative facts. Plaintiffs essentially allege that more money was borrowed than was needed for the legitimate expenses of land acquisition and development resulting in substantial diversion of sums for purposes unrelated to the development project. Counts I and II allege that the bank either negligently or in breach of the participation agreement made extra disbursements, failed to make an independent determination of the value of the land, failed to provide plaintiffs with information including Moorefield's certified financial statements, failed to notify plaintiffs of the borrowers' default and failed to insure that Moorefield complied with conditions imposed by the bank.

Count III, brought against all of the defendants, alleges a conspiracy to defraud

the plaintiffs by concealing the true cost of the land. Count IV alleges John and Marilyn DeLuca converted $169,866.90 in violation of the Credit Agreement.

The amended complaint sets forth four additional claims. Counts V and VI allege all defendants violated the federal securities laws by making material misrepresentations of fact. Count VII alleges that the bank breached fiduciary responsibilities toward the plaintiff within the coverage of ERISA. Finally, Count VIII is a diversity claim brought only against some of the "other defendants" alleging that they interfered with the contract between Moorefield Enterprises and the bank.

## I. The Securities Claims

The defendants raise a jurisdictional issue regarding plaintiffs' securities claims. They argue that neither the loan participation agreement or the underlying note are securities within the meaning of the federal securities laws and the court thus lacks subject matter jurisdiction to consider them. This court agrees.

■■■ The starting point in determining whether an instrument is a security is the specific language of the statute. *International Brotherhood of Teamsters v. Daniel*, 439 U.S. 551, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979). Section 3(a)(10) of the 1934 Securities Act, 15 U.S.C. § 78c(a)(10)[1] provides:

When used in this chapter, unless the context otherwise requires ... the term "security" means *any note*, stock, treasury stock, bond, debenture, certificate of interest or participation in profit-sharing agreement or in any oil, gas or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, *investment contract*, voting-trust certificate, certificate of deposit, for a security, or in general, any instrument commonly known as a "security"; *or any certificate of interest or participation in*, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or pur-

chase, *any of the foregoing*; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.

The plaintiffs argue that the plain meaning of the statute requires a finding that both the note and the pension fund's participation in the Moorefield note are securities. They rely upon several Second Circuit opinions and further maintain that defendants have the burden of demonstrating that the context of the transaction requires a different finding. The plaintiffs' arguments have been characterized as the "literal" approach and have been rejected because of the qualifying language in the statute. *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975); *American Fletcher Mortgage Co., Inc. v. U. S. Steel Credit Corp.*, 635 F.2d 1247 (7th Cir. 1980). The statutory language, in and of itself, will not mandate a finding that these instruments are securities. Rather, the court must look at the economic realities of the transaction in light of Congressional intent.

The Seventh Circuit in *C. N. S. Enterprises Inc. v. G & G Enterprises, Inc.*, 508 F.2d 1354 (7th Cir.) *cert. denied* 423 U.S. 825, 96 S.Ct. 38, 46 L.Ed.2d 40 (1975) adopted the "commercial/investment test" to determine whether a note is a security. The test attempts to distinguish between an ordinary commercial loan not covered under securities laws and an investment which is within the scope of those laws. The court observed that notes which are securities generally are acquired for speculation or investment and are offered to some class of investors. *Id.* at 1360 *citing McClure v. First National Bank*, 497 F.2d 490, 494 (5th Cir. 1974) *cert. denied* 420 U.S. 930, 95 S.Ct. 1132, 43 L.Ed.2d 402 (1975). But the court noted that it can apply no mechanical formula to make this distinction and each case

[1]. The definition of a security has been held to be the same for both the 1933 and 1934 Acts.

*Tcherepnin v. Knight*, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967).

**1188**

must be resolved on its own facts looking to the underlying nature of the transaction.

The facts here point to an ordinary commercial transaction. The loan here was for a fixed amount, fixed maturity and a stated interest rate. The governing Credit Agreement does not provide for a public offering of the note and there is no general class of investors. The note is secured in part by a Deed of Trust providing the lender with the kind of collateral indicative of a commercial transaction. The bank's profits from the transaction turn upon the original terms of the transaction and not upon another's efforts. All of these factors indicate a commercial arrangement between borrower and bank precluding coverage under the securities laws. See *American Fletcher Mortgage Co., Inc. v. U. S. Steel Credit Corp.*, 635 F.2d 1247 (7th Cir. 1980); *United American Bank of Nashville v. Gunter*, 620 F.2d 1108 (5th Cir. 1980); *Amfac Mortgage Corp. v. Arizona Mall of Tempe, Inc.*, 583 F.2d 426, 431 (9th Cir. 1978).

■■■ Nonetheless, the loan participation agreement may still be a security even if the note in the underlying transaction is not. *Avenue State Bank v. Tourtelet*, 379 F.Supp. 250, 254 (N.D.Ill.1974). Plaintiffs argue that the loan participation is an "investment contract" which falls within the purview of the securities laws. The Supreme Court in *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975) set out a four part test to determine whether an investment contract is a security. It must be (1) an investment, (2) in a common venture, (3) premised upon a reasonable expectation of profits, (4) to be derived from the entrepreneurial or managerial efforts of others. *Id.* at 852, 95 S.Ct. at 2060. See also *SEC v. W. J. Howey*, 328 U.S. 293, 301, 66 S.Ct. 1100, 1104, 90 L.Ed. 1244 (1946). The focus, once again, is on the economic reality of the transaction.

Four recent courts have applied the above standards and determined that loan participation agreements in similar circumstances fail to meet the *Forman* test. See *American Fletcher Mortgage Co. v. Steel*, 635 F.2d 1247 (7th Cir. 1980) (loan to development corporation for land acquisition and construction of residential condominiums); *United American Bank of Nashville v. Gunter*, 620 F.2d 1108 (5th Cir. 1980) (loan for acquisition of controlling stock interest in a bank); *Provident National Bank v. Frankfort Trust Co.*, 468 F.Supp. 448 (F.D.Pa.) (1979) (loan to finance construction of 25 single family townhouses); *FBS Financial Inc. v. Cleveland Trust Realty Investors*, Fed.Sec.L.Rep. (CCH) ¶ 96,341 (N.D.Ohio 1977) (loan for construction of office building).

The various documents indicate that the bank's loan was collateralized, with the return to the plaintiffs in the form of repayment of principal plus interest. The plaintiffs argue that this return is sufficient to meet the expectation of profits test. The Seventh Circuit recently held that a fixed rate of return does not constitute a "profit" within the meaning of *Howey*. *Canadian Imperial Bank of Commerce v. Fingland*, 615 F.2d 465, 470 (7th Cir. 1980). There was no expectation of appreciation in the value of the Credit Agreement or of a variable rate of return. Such a return is, thus, no different from that found in a commercial lending transaction. *Provident National Bank supra* at 454 *United American Bank of Nashville supra*, 620 F.2d at 1118 *FBS Financial Inc. supra* at ¶ 93,158.

■■■ Plaintiffs urge that they relied upon the managerial efforts of the bank as lead lender. The bank had the right to select inspectors, appraisers and insurance carriers, inspect the project and fully service the loan. Yet the loan participation agreement clearly specifies that the bank cannot modify the Credit Agreement or take any other action without the written and mutual consent of the plaintiffs. The bank's supervision and servicing of the loan would not generate the interest income; that income came from interest payment on the loan. Under those circumstances, it cannot be fairly stated that plaintiffs' profits were derived from the entrepreneurial or managerial efforts of others. See *American Fletcher Mortgage Co., supra*, 635 F.2d at

1254–5; *Provident National Bank, supra,* 468 F.Supp. at 454.

The Seventh Circuit recently observed in *American Fletcher Mortgage Co., supra* that "borrowing for a designated purpose and a short note maturity, here three years, are indicia of a commercial loan rather than an investment." *Id.* 635 F.2d at 1254. Here, as in *American Fletcher,* the money was borrowed for a specific purpose (development of land) and the maturity on the note was three years. The Seventh Circuit also noted that a collateralized loan with a fixed rate of return was not an investment premised upon a reasonable expectation of profits but was, rather, a commercial loan. The participation agreement here, as discussed above, was collateralized with a fixed rate of return. There was no public offering or general class of investors.

In *FBS Financial Inc., supra* the court relied upon the parties' characterization of the transaction as a loan. The court observed that although not dispositive the "pervasive use by FBS and Cleveland Trust of the term 'loan' to describe the subject transaction, coincident with the basic premise that Advance was the 'lead lender', provided proof that the parties viewed the transaction as a commercial loan." *Id.* at ¶ 93,156. The parties in this transaction continually referred to the deal as a loan. Arlington Trust was referred to as the lender in the loan participation agreement.

■ The plaintiffs insist that they were engaged in a joint venture with the bank. Although such ventures are more commonly between the developer and lender rather than the two lenders, that test may be satisfied. It is, however, insufficient to find the agreement a security in light of the counterveiling factors discussed above. The economic realities of this transaction simply do not support the conclusion that the loan participation agreement is a security. The defendants' motions to dismiss Counts V and VI are granted because this court lacks subject matter jurisdiction to consider them.

**2. The ERISA Claim**

Plaintiffs bring an ERISA claim against the defendant bank alleging that the bank breached its statutory duty as a fiduciary. The bank maintains that plaintiffs cannot enjoy the protection of ERISA because the bank is not a fiduciary under that Act and this court lacks subject matter jurisdiction to hear the claim.

■ To determine whether the bank is an ERISA fiduciary, the court must examine whether the bank had discretionary duties, since those duties are within the coverage of the statute while purely ministerial functions are not. Further, the court must make some attempt to ascertain the type of activity Congress sought to protect under the Act.

■ The Act defines a fiduciary: [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such a plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or responsibility in the administration of such plan. 29 U.S.C. § 1002(21)(A).

Some positions, such as trustee or plan administrator, inherently require discretionary fiduciary responsibilities; other positions assume fiduciary status because the party has performed one of the functions detailed in the Act. Little and Traikill, *Fiduciaries Under ERISA; A Narrow Path to Tread,* 30 *Vanderbilt L.Rev.* 1, 6 (1977); See 29 C.F.R. § 2509.75–5 ques. D–1. For instance, when a bank has full investment discretion as a trustee, it is a fiduciary under the statute. Similarly, when a bank gives investment advice it comes within the meaning of the statute. But, when a bank is a "directed trustee" following instructions of another fiduciary or is custodian of plan assets, its status is unclear. See *Fidu-*

*ciary Responsibility Under the Pension Reform Act, Special Problems of Banks,* 31 *Business Lawyer* 241 (1975).

Various courts have attempted to define the duties which bring a party within the coverage of the Act's fiduciary provision. In *Hibernia Bank v. International Brotherhood of Teamsters,* 411 F.Supp. 478 (N.D. Cal.1976), the plaintiff claimed to be a fiduciary under ERISA because of various obligations assumed by an agreement between the bank and trustees of the plan. The bank received employer payments, paid out administrative fees to the teamsters fund and transferred funds from savings accounts to commercial accounts. The agreement specified that the bank provide various other services, all of which were clearly detailed by the trustees[2] and did not require the bank to exercise its judgment. The court dismissed the ERISA claim finding that the above described services were ministerial.[3]

■ At the other end of the spectrum, on with authority to grant or deny claims, *Eversole v. Metropolitan Life Insurance Co.,* 500 F.Supp. 1162 (C.D.Cal.1980) or to recommend, design and implement an amendment to a profit-sharing plan *Eaves v. Penn,* 587 F.2d 453 (10th Cir. 1978) has the type of discretion and responsibility contemplated by the Act. In *Eaton v. d'Amato,* BNA Pension Reporter, No. 291, May 19, 1980 (D.D.C.1980), the trustees paid an organization (TFA) to provide a range of administrative and managerial services including processing and adjudicating claims for medical care, supervision of the operation of a dental clinic, supervision of a recordkeeping system used to administer various benefit plans and aided in conversion to more sophisticated data processing equipment. *Id.* at D–13. The court determined that TFA exercised far more than ministerial duties, finding defendants' reading of the statute unduly restrictive.

In the instant case, the bank was merely a servicing agent for a particular investment. The bank was never itself involved with the administration or management of the fund itself or in making its investment policies and decisions. The bank was required to fulfill various ministerial functions respecting one investment, including making advances to the borrower and remitting loan repayments to plaintiffs. The

2. The following "letter agreement" defined the commercial relationship between the Bank and the individual trusts:

"You [the Bank] are hereby appointed our agent for the purpose of performing the following services:

"1. To receive the employer remittance forms and payments.

"2. To deposit all employer payments to a daily interest savings account on the day received.

"3. To process all information on the remittance forms and supply us with daily accountings.

"4. To pay by trust cashiers check, monthly upon the direction of Mr. Kenneth W. Carlson, the applicable insurance premium.

"5. To pay by trust cashiers check, to the Teamsters [Security] Fund of Northern California, monthly upon the direction of Mr. Kenneth W. Carlson, the applicable administrative fees.

"6. From time to time, to make transfers from the trust savings account to our commercial account as directed by Mr. Kenneth W. Carlson.

"7. To render from time to time detailed statements of the trust account.

"This agreement shall remain in effect until terminated either by you or by us by written notice mailed to the other at our last known addresses, respectively. If this agreement is terminated by such notice, you shall be reimbursed and held harmless for any loss suffered from any action taken in good faith prior to receipt by you of actual knowledge of termination.

"You shall receive for your services a reasonable annual fee, said fee to be mutually agreed upon."

3. The Department of Labor in an interpretive release further defined duties considered ministerial. It stated that administrative services involving application of rules determining eligibility for benefits, calculation of services and compensation credits for benefits, preparation of employee communication material, maintenance of participants' service and employment records, preparation of reports required by government agencies, calculation of benefits, advising participants of their rights and obligations under the plan, collection of contributions and processing of claims would not make one a fiduciary absent further authority to make decisions as to plan policy, interpretation, practice and procedure. 29 CFR § 2509.75–8.

fixed terms of the loan and commercial nature of the transaction belie the plaintiffs' allegations of sufficient discretionary responsibility to come within the terms of the Act. Paragraph 5 of the participation agreement itself states:

[the bank] agrees that for so long as it holds the Note and the documents securing said Note, and as long as the Credit Agreement is in effect, it will not modify, amend, or terminate said agreements with [Moorefield] nor take any other action without participant's written consent.

■ At most, plaintiffs can show that the participation agreement itself gave the bank decision making authority binding plaintiffs when the parties failed to agree within a reasonable time upon action to be taken concerning an issue which materially affected their interests. (Paragraph 8) Paragraph 78(c) of the complaint alleges that the bank had authority to use reasonable steps to take and retain control of disbursements under the Moorefield loan. Paragraph 69(a) alleges that the bank was required to enforce obligations of the Credit Agreement to insure disbursement applied to a lawful use and purpose. Nonetheless, this authority is insufficient to constitute "authority or control respecting management or disposition of [the plan's] assets" within the meaning of the Act.

The motion to dismiss Count VII is granted.

### 3. Personal Jurisdiction and Venue

This court's ruling on the securities and ERISA claims converts this lawsuit into one based upon diversity jurisdiction. Five counts remain; two sound in contract, three sound in tort. All defendants have filed motions to dismiss for lack of personal jurisdiction and venue. These, of course, must be resolved with reference to standards in diversity cases. Therefore, the liberal venue provisions provided by the Securities Act are inapplicable.

■ Although personal jurisdiction matters are generally determined before venue, there is no requirement that it must be so.

As the Supreme Court recently stated in *Leroy v. Great Western United Corp.*, 443 U.S. 173, 99 S.Ct. 2710, 61 L.Ed.2d 464 (1979) on *remand*, 602 F.2d 1246 (5th Cir. 1979):

"Neither personal jurisdiction nor venue is fundamentally preliminary in the sense that subject matter jurisdiction is, for both are personal privileges of the defendant, rather than absolute strictures on the court, and both may be waived by the parties.... Accordingly, when there is a sound prudential justification for doing so, we conclude that a court may reverse the normal order of considering personal jurisdiction and venue." *Id.* at 180, 99 S.Ct. at 2715.

In *Leroy*, the Court was asked to decide a personal jurisdiction issue arising under the Texas long-arm statute. As that statute has been construed to authorize jurisdiction to the fullest extent permitted by the Constitution, its resolution required interpretation of novel constitutional issues which the court sought to avoid. Instead, the Court did not decide that issue but proceeded to adjudicate the dispute between the parties concerning venue.

■ The same considerations apply here. The plaintiffs seek to obtain jurisdiction over the defendants under the Illinois long arm statute because each defendant has in some way transacted business in Illinois. As with the Texas statute, the Illinois long arm statute has been interpreted to apply to the fullest extent of the due process clause. *Nelson v. Miller*, 11 Ill.2d 378, 143 N.E.2d 673 (1957). *Hutter Northern Trust v. Door County Chamber of Commerce*, 403 F.2d 481 (7th Cir. 1968). This court has reviewed the jurisdictional facts before it and finds that a close question exists as to whether assertion of jurisdiction over each of the defendants is appropriate.

The court's determination of the issue would indeed require constitutional interpretation of precisely the same nature that the Supreme Court sought to avoid in *Leroy*. It is also the case that resolution of the venue question will make adjudication of

the personal jurisdiction issue unnecessary. For that reason, this court will not decide the jurisdictional issue and proceed to determine defendants' challenge to venue in the Northern District of Illinois.

■ All parties agree that the statute controlling venue in this case is 28 U.S.C. § 1391(a) which provides:

A civil action wherein jurisdiction is founded only on diversity of citizenship may, except as otherwise provided by law, be brought only in the judicial district where all plaintiffs or all defendants reside, or in which the claim arose.

Since only two of the nine plaintiffs reside in Illinois and all of the defendants reside in Virginia, venue in the Northern District of Illinois is appropriate only if the claim arose here.

■ Venue is a Congressional prerogative which is designed to "facilitate the disposition of claims by providing, in appropriate cases, a more convenient forum to the litigants and witnesses involved." *H.R. Rep.No.*1893, 89th Cong., 2nd Sess. 2 (1966). As the Court of Appeals for the District of Columbia observed in *Lamont v. Haig*, 590 F.2d 1124 (D.C.Cir.1978):

Where "the claim arose" should be ascertained by advertence to events having operative significance in the case, and a common sense appraisal of the implications of those events for accessibility to witnesses and records. *Id.* at 1134.[4]

■ Other courts have emphasized that venue will be determined by where the "weight of contacts" occurred, *Redmond v. Atlantic Coast Football League*, D.C., 359 F.Supp. 666, 669–70; *California Clippers Inc. v. United States Soccer Football Association*, 314 F.Supp. 1057, 1062–63 (N.D.Cal. 1970). Venue, providing access to a particular federal court, is a Congressional determination which may not be and is not co-extensive with the due process clause. Thus,

the minimum contacts test applicable in the jurisdictional context is not the same as the weight of contacts test appropriate to determine venue.

The Supreme Court in *Leroy v. Great Western United Corp., supra*, provides the most recent analysis of the meaning of the phrase "district ... in which the claim arose." In that case, Great Western United Corporation, a Texas based corporation, attempted to initiate a tender offer for the shares of a silver mining operation which had substantial assets in Idaho. Pursuant to a state statute regulating tender offers, Idaho officials entered an administrative order delaying the offer. Great Western brought suit in Texas against the Idaho officials responsible for enforcing the statute. The corporation sought a declaratory judgment that the state statute was invalid insofar as it regulated interstate tender offers already subject to regulation under the federal securities laws.

The lower courts found venue in Texas proper because that is where Idaho officials invalidly prevented Great Western from initiating a tender offer and Texas is where the impact of that decision was felt. The Supreme Court disagreed and found venue improper in Texas. The Court restricted venue to the district that was the "locus" of the party's claim, stating:

"In our view ... the broadest interpretation of the language of § 1391(b) that is even arguably acceptable is that in the unusual case in which it is not clear that the claim arose in only one specific district, a plaintiff may choose between those two (or conceivably even more) districts that with approximately equal plausibility—in terms of availability of witnesses, the accessibility of other relevant evidence and the convenience of the defendant (but not of the plaintiff)—may be assigned as the locus of the claim. *Id.* 443 U.S. at 185, 99 S.Ct. at 2718.

---

4. 28 U.S.C. § 1391 contains venue provisions for all types of cases including diversity and federal questions.

The phrase "in which the claim arose" is used in § (a) and (b) and where "the cause of action arose" in (e). This court believes that the phrase has the same meaning regardless of the type of case involved. Therefore, this court will freely discuss cases involving sections (b) and (e) as well as (a) which is the precise provision subject to adjudication.

The Court then found the case was not unusual and its obvious locus was Idaho. The action taken was in Idaho by Idaho residents. Moreover, the bulk of the relevant evidence and witnesses were located in Idaho, and the federal courts in Idaho were better able to construe Idaho law than judges sitting elsewhere. *Id.* at 186, 99 S.Ct. at 2718.

The action here is not unusual and the locus of the claim is clearly Virginia. The alleged diversions of funds providing the basis for this action resulted from activities taken by Virginia residents in Virginia. All parties other than plaintiffs' employees are located in Virginia. With the exception of the participation agreement which was executed in Illinois, the relevant documents were substantially negotiated, drafted, executed and performed in Virginia. The parties agree that Virginia law is to apply to determine rights under the agreements. As the court discussed in *Leroy*, Virginia judges are in the best position to apply their own laws.

The plaintiffs emphasize that the impact of defendants' wrongful actions will be felt in Illinois because the pension fund is located here. That argument was rejected by the Court in *Leroy* and the Seventh Circuit in *Reuben H. Donnelly Corp. v. FTC*, 580 F.2d 264, 268 (7th Cir. 1978) as a basis for laying venue. The court feared accepting such an argument would allow plaintiffs to manipulate venue to their convenience, a result not anticipated by the venue statute.

 Plaintiffs also underscore the contacts of the various defendants with Illinois. They point out that the proceeds were disbursed in Illinois and the money was wired from Illinois. The bank was in Illinois three times and some of the other defendants were here on several occasions involving either negotiation discussions or implementation of the agreement. These contacts do not change this court's conclusion that the locus of the claim is in Virginia. As discussed earlier, contacts which may be sufficient for jurisdictional purposes are not necessarily enough to lay venue.

The defendants maintain that the bulk of witnesses and evidence are in Virginia. Plaintiffs have not suggested otherwise. Since venue is primarily a question of convenience, that fact bolsters this court's determination.

In light of our ruling that venue is improperly laid in the Northern District of Illinois, this court will on its own motion transfer the case to the appropriate forum, the Eastern District of Virginia. 28 U.S.C. § 1406(a) provides:

> The district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been·brought.

It is well established that a court may transfer a case to a district where jurisdiction is proper whether or not the transferring court had jurisdiction over the defendants. *Goldlawr v. Heiman*, 369 U.S. 463, 82 S.Ct. 913, 8 L.Ed.2d 39 (1962). Since all defendants are Virginia residents, the Virginia courts can properly assert jurisdiction over all of the defendants. Some of the remaining state law claims may be time barred under the local statute of limitations if plaintiffs were forced to begin anew. Since this court believes that plaintiffs have stated several causes of action against the defendants, it believes that the fairest course is to allow those claims to be litigated. Therefore, the case will be transferred.

The "other defendants" have also filed a motion to dismiss Count VIII of the amended complaint. That count alleges that the other defendants interfered with the contract between Moorefield Enterprises and the bank. Since the case is being transferred to Virginia and Virginia law is applicable to resolution of the motion, this court will defer to the Virginia courts for decision on that motion.

The defendants' motions to dismiss the federal claims are granted. The court does not believe venue is appropriate in this district and will transfer the case to the Eastern District of Virginia. Ruling on Count VIII of the amended complaint is deferred.