Neil A. USEDEN, as Trustee of the Air Florida System, Inc., Profit Sharing Plan and Trust, Plaintiff,

v.

C. Edward ACKER, Plan Fiduciary, Eli Timoner, Former Trustee, Donald Lloyd Jones, Former Trustee, Jon R.K. Tinkle, Plan Fiduciary, Florentino Gonzalez, Plan Fiduciary and Plan Administrator, William Hegler, Plan Fiduciary and Plan Administrator, Robert Leycock, Plan Fiduciary and Plan Administrator, AIR Florida System, Inc., Plan Sponsor, Air Florida, Inc., Plan Sponsor, System Service, Inc., Plan Sponsor, System Leasing Inc., Plan Sponsor, Air Florida–Sunshine Subsidiary, Inc., Plan Sponsor, Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A., Plan Fiduciary, William C. Miesch, Plan Fiduciary, Great American Insurance Company, Plan Fiduciary and a Party in Interest, Great American Insurance Life Insurance Company, Plan Fiduciary and Party in Interest, American Financial Corporation, Plan Fiduciary and a Party in Interest, Sun Bank, N.A., Plan Fiduciary and a Party in Interest, Aetna Insurance Company, Insurer, Defendants.

No. 85–0002–Civ.

United States District Court, S.D. Florida.

March 29, 1989.

**1234**

Robert Shupack, Hollywood, Fla., Edward A. Kaufman, Miami, Fla., for plaintiff.

Irving Miller, Miami, Fla., Mitchell Fuerst, Miami, Fla., David Cooney, Ft. Lauderdale, Fla., Sanders Campbell, Reuben Ginsberg, Dallas, Tex., Joseph H. Lowe, Miami, Fla., for defendants.

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

RYSKAMP, District Judge.

This cause was before the court on defendants, Sun Bank of Miami, N.A.'s, Sun Bank, Inc.'s (collectively "Sun Bank") Greenberg, Traurig, Askew, Hoffman, Lipoff, Rosen & Quentel's ("Greenberg, Traurig") motions for final summary judgment, Eli Timoner's ("Timoner") and Cesar Alvarez's ("Alvarez") motions for partial summary judgment, and Sanders Campbell's ("Campbell") motion for final summary judgment. In addition, plaintiff, Neil A. Useden, As Trustee for the Air Florida System, Inc. Profit Sharing Plan and Trust's ("Useden") partial motion for summary judgment against the above defendants, Oliver Kimberly and Donald Lloyd–Jones was before this Court.

For the reasons set forth below, this Court determines that defendants, Sun Bank's and Greenberg, Traurig's motions for final summary judgment are granted. In addition, Alvarez's motion for partial summary judgment with respect to the issue of punitive damages is granted. The Court reserves ruling on the motions for partial summary judgment on the issue of the statute of limitations.[1] Plaintiff's motion for partial summary judgment and defendant, Campbell's motion for final summary judgment are denied. Finally, plaintiff's supplement to rule 10J statement of material and disputed facts and the affidavit of Donald Lloyd–Jones, served on Greenberg, Traurig on December 14, 1988 are hereby stricken from the record and plaintiff's motion for continuance or extension of time for filing affidavits and *ore tenus* motion to amend the complaint as to Sun Bank are hereby denied.

## UNDISPUTED FACTS

1. The Air Florida System, Inc. Profit Sharing Plan and Trust ("Plan") was established by Air Florida Systems, Inc. and Air Florida, Inc. (collectively "Air Florida") on September 12, 1977.[2] The Plan was amended five times, with the last amendment effective on August 1, 1980.

2. Greenberg, Traurig, was at all times material, and is, a law firm practicing in Dade County, Florida. Greenberg, Traurig provided legal services to the Plan from its inception until December, 1982 and to Air Florida from the early 1970's until August, 1982.

3. Greenberg, Traurig drafted the Plan, which was patterned after a similar profit sharing plan instituted by Southwest Airlines. The characteristic feature of the Plan was that it was an eligible individual account plan, as defined by ERISA, and it was to invest exclusively in employer securities—that is stock of Air Florida or its affiliates. The employer securities ac-

---

1. Defendants Eli Timoner and Greenberg, Traurig, moved for summary judgment on the issue of the statute of limitations. Alvarez adopted Timoner's motion.

2. The Plan was made retroactively effective to August 1, 1976.

quired by the Plan were to be held by the Plan for extended periods of time and distributed to Plan participants entitled to receive benefits pursuant to the terms of the Plan.

4. Timoner was the named trustee of the Plan from its inception through July 10, 1982, when Timoner suffered a debilitating stroke, at which time Donald Lloyd–Jones ("Lloyd–Jones") assumed Timoner's responsibilities with regard to the Plan. Under the terms of the Plan, the Trustee of the Plan was authorized to borrow or raise money for the purposes of the Plan and was authorized to pledge all or any part of Plan assets to secure the repayment of such a borrowing.

5. Timoner was also the Chief Executive Officer and Chairman of the Board of Air Florida from July 1971 through July 1977 and President and Chief Operating Officer of Air Florida from August 1977 through September 1981. From August 1977 to September 1981, C. Edward Acker ("Acker") was the Chief Executive Officer and Chairman of the Board of Air Florida. Acker left Air Florida in September 1981, at which time Timoner reassumed the positions of Chief Executive Officer and Chairman of the Board of Directors. In June 1982, Lloyd–Jones joined Air Florida and was appointed Chief Executive Officer and President. After Timoner's stroke, Lloyd–Jones assumed Timoner's corporate duties.

6. In November 1977, Neil A. Useden Associates, Inc. ("Useden Associates") entered into a Plan Service Agreement with Air Florida, where Useden Associates agreed to render certain services to the Plan. On May 8, 1984, plaintiff was appointed Trustee of the Plan. On January 2, 1985, plaintiff instituted this action. Greenberg, Traurig, Sanders Campbell and Oliver Kimberly were not named as defendants until September 1986.

7. Sun Bank of Miami, N.A. is, and at all times material was, a national banking association performing banking functions in Dade County, Florida.

8. Sun Bank, Inc. is located in Orlando, Florida and is a bank holding company which owns all of the outstanding shares of stock of Sun Bank of Miami, N.A. Sun Bank, Inc. has a separate board of directors and separate officers from Sun Bank of Miami, N.A. and did not make the loan that is the subject of this litigation.

9. Sun Bank was one of several banks that provided commercial banking services to Air Florida between 1977 and 1984. Beginning in early 1980, Sun Bank developed a commercial lending relationship with Air Florida and made several loans to Air Florida to enable it to purchase aircraft.

10. Edmund C. Timberlake ("Timberlake") was the commercial banking officer at Sun Bank who maintained contact with Air Florida with regard to its outstanding commercial loans and its commercial banking relationship. Pursuant to his role as commercial lending officer for the Air Florida account Timberlake continuously monitored Air Florida's financial status.

11. On November 11, 1977, Air Florida contributed 50,000 shares of Air Florida common stock to the Plan. On December 30, 1979, the Plan purchased 22,400 shares of Air Florida Series A Preferred Stock. At all times material, the Air Florida common stock did not pay either a cash or stock dividend. The Series A Preferred Stock, convertible into 2½ shares of common stock, paid a $.90 annual dividend per share. In addition, the preferred stock carried a "cheap stock" privilege, meaning that a preferred stock owner could purchase ⅛ of a share of common stock in exchange for $.50 of the $.90 dividend. Thus, subsequent to the December 31, 1979 purchase of Series A Preferred Stock, the Plan acquired 2,800 additional shares of Air Florida common stock through conversion of the Series A Preferred Stock dividends. As of May 1981, the Plan also had approximately $700,000.00 in cash as a result of cash contributions from Air Florida.

12. In late 1980 to early 1981, Great American Life Insurance Company ("GALIC") began to dispose of its substantial holdings of Air Florida stock. A significant number of shares were sold by GALIC to Solomon Brothers at a discount from the market price, and later resold by Solomon Brothers in the market. By late May 1981,

GALIC's holdings were less than 10% of the outstanding shares of Air Florida stock.

13. In early 1981, Acker and Timoner became aware of GALIC's desire to dispose of certain Air Florida shares of preferred stock and convinced GALIC to sell those shares of stock to the Plan at the same discounted price of the sale of shares to Solomon Brothers.

14. Thus, the Plan purchased 76,000 shares of Series A Preferred stock from GALIC, which was the equivalent of 190,000 shares of common stock. The purchase price for the 76,000 shares of preferred stock was calculated based on the common share equivalent of 100,000 shares at $8.795 per share and 90,000 shares at $12.70 per share for a total purchase price of $2,022,500, averaging $10.65 per share.[3]

15. The purchase of the stock by the Plan occurred shortly after a public offering of Air Florida common stock in May 1981. In this public offering, Air Florida initially offered 2,000,000 shares. The offering was increased to 3,000,000 shares as a result of market demand. The offering sold at $13.50 per share. Moreover, additional stock owned by GALIC was sold in a public offering pursuant to demand registration rights owned by GALIC. In this offering, GALIC sold 1,900,000 shares. Thus, in the early part of 1981, 4,900,000 shares of Air Florida common stock were sold to the public.

16. The Plan paid for 76,000 shares of Series A Preferred Stock with existing cash and with the proceeds of a nine-month, short-term loan from Sun Bank in the amount of $1.6 million (the "Loan"). The Loan was originally secured by the 76,000 shares of preferred stock purchased, and 40,000 shares of Air Florida common stock owned by the Plan.

17. At the time the decision to purchase the stock was made, senior management of Air Florida, including Timoner, anticipated making a substantial cash contribution to the Plan in the first quarter of 1982 for the fiscal year ending December 31, 1981. The anticipated contribution, based upon Air Florida's expected year end profits, would have been more than sufficient to satisfy the Plan's indebtedness to Sun Bank.

18. Sun Bank's evaluation of the Plan's ability to repay the Loan (and Air Florida's ability to make the year-end contribution to the Plan) was based upon financial information contained in reports filed with the Securities and Exchange Commission; Sun Bank's financial analysis of the past and projected growth of Air Florida; other banks' assessments of Air Florida; Timberlake's own analysis based upon his ongoing relationship with Air Florida as a commercial lender; and the market value of Air Florida stock. Upon the evaluation of these factors Sun Bank determined that it was likely that the Plan would receive a substantial contribution from Air Florida thereby permitting it to satisfy the Loan obligation.

19. Prior to making the Loan, Sun Bank specifically evaluated particular aspects of this Loan. Accordingly, in a memorandum from Timberlake to the Credit File dated May 11, 1981, Timberlake outlined four areas of concern to be resolved by Sun Bank before the Loan could be made to the Plan. The four areas of concern were: (i) the applicability of Regulation U of the Federal Reserve Board to the Loan; (ii) the effect of Rule 144 of the Securities and Exchange Commission on the ability to sell the stock collateral; (iii) the legality of the Loan under ERISA; and (iv) the effect of S–16 demand registration rights on the ability to sell the stock collateral.

20. In a memorandum from Timberlake to the Finance Committee dated May 20, 1981, Timberlake demonstrated that each issue identified in the May 11, 1981 memo had been addressed and resolved. Thus, Timberlake (i) ascertained that the Loan to the plan would be subject to Regulation U, and accordingly, Sun Bank could Loan the Plan up to 50% of the value of the collateral pledged by the Plan to secure the Loan; (ii) acknowledged that, absent regis-

---

**3.** Pursuant to Article V, Section 5.1 of the Plan, Plan participants entitled to receive benefits could be issued common stock free and clear of any restrictions. SEC Release No. 33–6188.

tration, the shares of stock pledged by the Plan to secure the Loan would be subject to a two-year holding period mandated by Rule 144; (iii) was advised that ERISA did not prohibit the Loan and that Sun Bank would receive a legal opinion from the law firm of Greenberg, Traurig that the borrowing did not violate ERISA, but concluded that under ERISA, in consideration of earlier conversations with officials of the Plan, Sun Bank would not be able to become Trustee for the Plan as long as the Loan remained outstanding; and (iv) was assured that Air Florida, the Plan sponsor, would provide S–16 demand registration rights to Sun Bank so that the stock collateral could be registered in approximately three days enabling Sun Bank to exercise its rights with regard to the stock collateral.

21. On June 26, 1981 the Loan from Sun Bank to the Plan closed. The documents exchanged during the loan closing included: (i) a promissory note dated June 26, 1981 by and between the Plan and Sun Bank (the "Promissory Note"); (ii) an opinion letter from Greenberg, Traurig to Sun Bank opining, *inter alia*, that Timoner as the Plan Trustee had the power and authority to borrow funds on behalf of the Plan and that the Loan would not violate the Plan or ERISA; (iii) a Federal Reserve Form U–1 executed by Timoner and Timberlake; and (iv) a letter from Air Florida to Sun Bank indicating Air Florida's agreement to provide an S–16 registration statement should it become necessary for Sun Bank to sell the stock in the event of default. After the Loan closed, Sun Bank took possession of the stock collateral (76,-000 shares of Series A preferred and 40,000 shares of common) along with stock powers endorsed in blank.

22. The Promissory Note called for three quarterly interest payments with interest payable at the prime rate. The principal balance was due on March 31, 1982. In addition, the Promissory Note contained, *inter alia*, an "insecurity clause," a clause permitting Sun Bank to require additional collateral, and a typewritten provision in-

volving conversion of the preferred shares to common in the event of a monetary default. In addition, the Plan and Sun Bank agreed that if the value of the collateral pledged to secure the Loan fell below 130% of the outstanding Loan balance, additional collateral would be furnished to Sun Bank to adequately secure the Loan.[4]

23. In placing a value on the stock pledged to secure the Loan for Regulation U purposes, Timberlake multiplied the number of shares of Series A preferred stock pledged to secure the Loan (76,000) by their common share equivalent of 2.5 and added that number (190,000) to the 40,000 shares of common stock pledged, to arrive at 230,000 equivalent shares of common stock. Timberlake then multiplied the 230,000 common shares by $16.00 per share—the traded market value of Air Florida System, Inc. stock on June 26, 1981. Thus, the value of the collateral on the date of the Loan was determined to be $3.68 million.

24. Prior to the purchase of the stock from GALIC, Cesar Alvarez, a partner at Greenberg, Traurig in the Corporate Securities Department, and the contact between Greenberg, Traurig, Air Florida and the Plan, was contacted by Timoner and was advised that the Plan had an opportunity to buy stock from GALIC at a significant discount. Greenberg, Traurig was asked if the purchase could be made. After researching the matter, Alvarez advised Timoner that the purchase of the shares and the borrowing of funds would not be in violation of the Plan documents or ERISA.

25. Greenberg, Traurig, as counsel for the Plan provided legal services in connection with the acquisition of the shares from GALIC and the borrowing from Sun Bank.

26. In late August of 1981, Acker resigned his position at Air Florida and joined Pan American World Airways ("Pan Am") as Chief Executive Officer. Pan Am thereafter aggressively competed with Air Florida for passengers on the New York to Miami route. In the fall of 1981, Acker disposed of his substantial holdings in Air

---

**4.** Such a loan to value relationship is commonly known as a 70% margin call.

Florida. Acker's resignation was considered to be a serious setback for the continued high profitability of Air Florida.

27. On August 3, 1981, a strike by the Professional Air Traffic Controllers ("PATCO") caused severe reductions in the operating levels of all U.S. based airlines. The reduction in operating levels negatively influenced operating revenues and profits of each airline, including Air Florida.

28. During the late summer and early fall of 1981 Pan Am began a fare war on the New York to Miami route, a key route for Air Florida, thereby creating a serious loss in revenues for Air Florida.

29. On September 1, 1981 Alvarez resigned from Greenberg, Traurig and joined Air Florida as a full-time employee. After September 1st, upon becoming a full-time employee at Air Florida, Alvarez was named Senior Vice–President, and no longer had any affiliation with the law firm.

30. In September 1981, Timoner as Trustee, inquired of Shearson, Lehman as to whether or not the Plan could dispose of its holdings in Air Florida. Shearson, Lehman advised that the Plan could, but a public disclosure would have to be made. Timoner consulted with Alvarez and Greenberg, Traurig, and was advised that Shearson, Lehman's advice concerning public disclosure of such a disposition as required by the securities laws was correct.

31. During the period August 30, 1981 through January 30, 1982, the price per share of the Air Florida common stock fell from $13⅛ to $6⅜.

32. On January 13, 1982, an Air Florida aircraft crashed on takeoff after leaving National Airport in Washington, D.C. This event caused a further depression in the revenues of Air Florida. The crash together with the other negative influences on Air Florida's revenues and profits caused Sun Bank to review the status of the Loan to the Plan.

33. By January, 1982 the value of the stock pledged to Sun Bank as collateral for the Loan fell below the amount necessary to retain the agreed upon margin requirements. Sun Bank communicated its concerns over the value of the collateral to the Plan. At this time, Greenberg, Traurig was contacted by Air Florida on behalf of the Plan, and was advised that because of a decline in the price of Air Florida stock in the market, Sun Bank was requesting additional collateral. Greenberg, Traurig was asked if Air Florida could guaranty the loan to the Plan. The advice given by Greenberg, Traurig to Air Florida and the Plan was that Air Florida could not give a guaranty for a profit sharing plan, however, if the Plan was converted to an Employee Stock Ownership Plan ("ESOP"), then it could give such a guaranty.

34. On January 22, 1982, by resolution, and unbeknownst to Greenberg, Traurig, the Executive Committee of the Board of Directors of Air Florida authorized Air Florida to take the necessary steps to convert the Plan into an ESOP and to guaranty up to $1.6 million of the Loan to the Plan.

35. On January 28, 1982, Air Florida, Inc. guaranteed the Loan. The Guaranty was signed by Eli Timoner, President of Air Florida. On February 3, 1982, Air Florida, Inc. guaranteed the Loan a second time. The February 3, 1982 guaranty was signed by Cesar L. Alvarez, Senior Vice President of Air Florida.

36. During the first few days of February, 1982, Florentino Gonzalez, Senior Vice President—Finance and Senior Financial Officer of Air Florida ("Gonzalez"), informed Timberlake that the Plan had been converted to an ESOP. Accordingly, Timberlake began referring to the Plan as an ESOP.

37. As a result of the decrease in the value of the collateral pledged to secure the Loan, at various times during the first six months of 1982, cash collateral (in the form of repurchase agreements) was pledged to provide additional security for the Loan. Moreover, additional Air Florida stock owned by the Plan and Western Airlines stock owned by Air Florida was pledged to secure the Loan. At the time, Greenberg, Traurig was unaware of the pledges of additional collateral.

38. During the early part of March, 1982, Gonzalez informed Timberlake that Air Florida would not be making a contribution to the Plan. Thus, the Plan was not going to be in a position to satisfy the outstanding Loan obligation on March 26, 1982, the date the Loan was due.

39. On March 15, 1982, Timberlake recommended to Sun Bank that the maturity date of the Loan be extended for a period of 30 days, so that Sun Bank could review the 1981 year-end financial statements for Air Florida.

40. As a result of negotiations between Sun Bank and the Plan, the Promissory Note was renewed, and a renewal note (the "Renewal Note") was purportedly signed by Eli Timoner on June 24, 1982. The Renewal Note was due on March 31, 1983. There is no evidence that Greenberg, Traurig was consulted, advised or even knew of this transaction.

41. Throughout early 1982, Timberlake was of the opinion that Air Florida would survive the financial hardship it was enduring and would continue to be profitable.

42. On June 25, 1982, a member of the executive loan committee of Sun Bank, transmitted a memorandum to Timberlake indicating that he and the other members of the loan committee were concerned about the diminishing value of the collateral pledged to secure the Loan and of the persistent out-of-margin status of the collateral for the Loan.

43. On July 10, 1982 Timoner suffered a disabling stroke. His duties, both on behalf of Air Florida and on behalf of the Plan were assumed by Lloyd–Jones, who at that time and thereafter was authorized to act on behalf of Air Florida and the Plan.

44. During the last week of July, 1982, as a result of negotiations between Timberlake and Lloyd–Jones, the sum of $297,441.96 which had been held as cash collateral in a repurchase agreement was applied to reduce the outstanding Loan balance of $1.6 million.

45. As a result of the financial difficulties of Air Florida and the persistent out-of-margin status of the collateral pledged to secure the Loan, Sun Bank determined that the prospect of payment of the Loan was impaired. Accordingly, on August 4, 1982 Sun Bank demanded payment of the outstanding principal Loan balance. Payment was demanded by 2:00 p.m., Friday, August 6, 1982. Upon receipt of the demand, Lloyd–Jones referred the matter to Greenberg, Traurig to prepare a response to the demand letters. Seth Joseph, an attorney in Greenberg, Traurig's Corporate Securities Department prepared a response dated August 6, 1982. On August 6, 1982 Sun Bank received the response to its August 4, 1982 letter. In the response, Greenberg, Traurig urged Sun Bank to reconsider its position and threatened legal action if the Loan was foreclosed. On August 9, 1982 counsel for Sun Bank renewed Sun Bank's demand for payment in full of the outstanding Loan balance.

46. After substantial negotiation between the Plan and Sun Bank, on August 16, 1982 the Plan and Sun Bank agreed to amend and redocument the Loan. On August 30, 1982 the Loan was amended and redocumented. The amended and redocumented note was due on March 31, 1983. Lloyd–Jones executed the documents setting forth the redocumentation on behalf of the Plan as Interim Trustee. Greenberg, Traurig represented the Plan and Air Florida in negotiating the legal terms of the agreement with Sun Bank. The final redocumentation, as is customary, required that if any notices were sent from Sun Bank to Air Florida and the Plan, a copy be sent to counsel—Greenberg, Traurig.

47. In October and November, 1982, after the Loan fell out of margin pursuant to the Loan redocumentation, Lloyd–Jones notified Sun Bank that the Western Airlines stock pledged as collateral for the Loan was to be sold, and the proceeds of the sale would be used to partially satisfy the outstanding principal balance of the Loan. Accordingly, on November 15, 1982, the outstanding principal balance was reduced to $602,579.29.

48. During March through July, 1983, after the Plan defaulted on the Loan by failing to pay interest and principal when

due, with the consent and cooperation of Lloyd–Jones, Interim Trustee, a portion of the remaining stock collateral was sold and the proceeds of the sale were used to satisfy the outstanding principal Loan balance.

49. On July 28, 1983, Lloyd–Jones was informed that the Loan had been satisfied and that 21,920 shares of Air Florida preferred stock and 22,140 shares of Air Florida common stock were being returned to the Plan.

50. Commencing in June, 1982, corresponding to the beginning of Lloyd–Jones' tenure, Greenberg, Traurig's relationship as outside counsel to Air Florida diminished and new counsel was retained. By the end of August, 1982, Greenberg, Traurig was no longer counsel to Air Florida. The law firm continued to provide services to the Plan on an as-requested basis. Greenberg, Traurig, pursuant to the notice requirements of the redocumentation, continued to automatically receive copies of correspondence directed to Air Florida and the Plan. However, Lloyd–Jones did not request Greenberg, Traurig to take any action in response to Sun Bank's correspondence.

51. In the last quarter of 1982, Steven Lapidus of Greenberg, Traurig was made aware of the events that had transpired. Though he had been informed during the summer that Air Florida wished to convert the Plan to an ESOP, and had begun to draft the ESOP document, he was unaware of the various guaranties by Air Florida, the pledge of additional collateral, or the reduction of the principal amount of the Loan without a corresponding reduction in collateral.

52. Lapidus, having learned of the Board resolution dated January 22, 1982 sent a letter dated December 23, 1982 setting forth a number of options for Air Florida and the Plan to pursue to correct any violations of ERISA which may have been inadvertently committed in Air Florida's attempt to protect the Plan and Plan participants. The options proposed by Lapidus, included converting to an ESOP and seeking administrative exemptions from the Department of Labor. Neither Air

Florida nor the Plan ever responded to the letter or ever again requested Greenberg, Traurig to perform services.

53. In the summer of 1983, Lapidus learned that Greenberg, Traurig had been replaced as counsel to the Plan by Stanley Kuperstein.

54. Any of the findings of fact which constitute conclusions of law are hereby adopted by the Court as conclusions of law.

## CONCLUSIONS OF LAW

1. Plaintiff in this action seeks relief against the various defendants for alleged violations of the Employee Retirement Income Security Act of 1974, P.L. 93–406, 88 Stat. 829, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA").

2. Counts III, IV, V, VI, VII, VIII, X, XV and XVIII of the second amended complaint ("complaint") seek relief against Sun Bank pursuant to ERISA, claiming violations of Section 29 U.S.C. § 1104 (Fiduciary duties); 29 U.S.C. § 1106 (Prohibited transactions); 29 U.S.C. § 1107 (Limitation with respect to acquisition and holding of employer securities and employer real property by certain plans); 29 U.S.C. § 1108 (Exemptions from prohibited transactions); 29 U.S.C. § 1109 (Liability for breach of fiduciary duty); 29 U.S.C. § 1112 (Bonding).

3. Counts IX and XX of the complaint seek relief against Greenberg, Traurig pursuant to ERISA, claiming violations of 29 U.S.C. § 1106 (Prohibited transactions); 29 U.S.C. § 1104 (Fiduciary duties) and 29 U.S.C. § 1109 (Liability for breach of fiduciary duty).

4. Count VIII of the complaint seeks punitive damages under ERISA, against Timoner, Alvarez, Campbell, Kimberly, Sun Bank and others.[5]

5. Each of the counts alleging liability under ERISA against Sun Bank and Greenberg, Traurig are predicated upon the allegation that Sun Bank and Greenberg, Traurig were, pursuant to 29 U.S.C. § 1002(21)(A), fiduciaries of the Plan. In addition, with regard to Greenberg, Trau-

---

**5.** Plaintiff does not seek punitive damages from defendant Greenberg, Traurig.

rig, the complaint alleges as an alternative theory of liability, that Greenberg, Traurig was a non-fiduciary knowingly participating, with a plan fiduciary, in a breach of that fiduciary's duty.[6]

6. As discussed below, the undisputed facts show that as a matter of law, Sun Bank and Greenberg, Traurig were not fiduciaries of the Plan. Moreover, the record is devoid of any evidence indicating that Greenberg, Traurig or Sun Bank knowingly participated in any breach of fiduciary duty owed by the plan fiduciaries.[7]

A. *Standard For Granting A Motion for Summary Judgment*

7. A motion for summary judgment is appropriately granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). In addition, a principal purpose of Rule 56 is to isolate and dispose of claims that find no support in the record, thereby permitting their expeditious disposal. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Thus, the mere existence of a factual dispute that lacks sufficient probative value will not defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

B. *Claims for Breach of Fiduciary Duty Under ERISA*

8. Plaintiff's ERISA claims against Sun Bank and Greenberg, Traurig allege that the Bank and the law firm breached their statutory duties as ERISA fiduciaries. For the alleged violations of ERISA, plaintiff attempts to recover damages pursuant to 29 U.S.C. § 1132(a)(2). Sun Bank and Greenberg, Traurig reason that the plaintiff cannot maintain an action against them under ERISA because they are not fiduciaries under the Act.[8]

9. The Act defines a fiduciary:

[A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such a plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or responsibility in the administration of such plan. 29 U.S.C. § 1002(21)(A).

10. With regard to Sun Bank, to determine whether it is an ERISA fiduciary, the Court must examine whether the Bank had discretionary duties with regard to the Plan. *O'Toole v. Arlington Trust Co.,* 681 F.2d 94 (1st Cir.1982).

11. Plaintiff maintains that Sun Bank did *not* become a fiduciary when the Loan transaction was consummated, but only became a fiduciary sometime later, when Sun Bank attempted to exercise its rights pursuant to the Loan transaction. Thus, plaintiff recognizes that it is not the existence of the borrower-lender relationship or of

---

**6.** There is no count in the complaint that alleges that Sun Bank is liable to Useden as a non-fiduciary knowingly participating, with a plan fiduciary, in a breach of that fiduciary's duty. At the hearing on the pending motions for summary judgment, plaintiff, *ore tenus,* moved that the complaint be amended to permit a claim against Sun Bank for non-fiduciary liability under ERISA. The request for such an amendment is denied. Notwithstanding, this Court has found that there is no evidence indicating that Sun Bank knowingly participated in a breach of fiduciary duty.

**7.** Plaintiff also alleges that Sun Bank is a party in interest. A party in interest involved in a prohibited transaction with a plan may be liable to the plan for "correction" of the prohibited transaction. 29 U.S.C. § 1106(a)(1) (1985); 29 C.F.R. § 2560.502i (1987). Plaintiff has conceded that the only basis for his claim that Sun Bank is a party in interest is his allegation that Sun Bank is a fiduciary. *See* Deposition of Jeffrey Clayton at 426. Therefore, if Sun Bank is not a fiduciary, it is not a party in interest.

**8.** Neither Sun Bank or Greenberg, Traurig were named trustees or fiduciaries to the Plan.

the various rights appurtenant to such a relationship—such as the ability of the borrower to demand additional collateral or to declare a default—that give rise to a lender's fiduciary status. Plaintiff argues only that it is the exercise of those rights that give rise to fiduciary status. Moreover, plaintiff claims that the Bank exercised rights over the Plan beyond those rights contemplated in a commercial lending relationship and by doing so became a fiduciary.

12. The establishment of an ordinary commercial debtor/creditor relationship between a lending bank and an ERISA plan and the subsequent exercise of the bank's rights thereunder does not create a fiduciary relationship between the lender bank and the plan.[9]

In *O'Toole v. Arlington Trust Co.*, 681 F.2d 94 (1st Cir.1982), plan assets of a pension plan established by an employer were deposited with a bank, which had also extended loans to the employer. The loans were guaranteed by the plaintiffs, who were trustees of the pension plan and officers of the employer. When the bank learned that the employer was in financial difficulty, it used the deposited plan assets to offset the outstanding loan. The trustees of the pension plan attempted to enjoin the improper offset, alleging federal jurisdiction under ERISA. In granting the bank's motion to dismiss, the court found that there was no federal jurisdiction under ERISA because the bank was not an ERISA fiduciary under § 1002(21)(A) and accordingly not chargeable with a breach of fiduciary duty. *Id.* at 95–97. The court found:

> [T]he bank's responsibility as dispository for the pension funds did not include the discretionary, advisory activities described by the statute—activities, which

were in fact performed by [the trustees]. In the absence of these activities, it would be unfair to impose on [the bank] the responsibilities and liability created by the statute for fiduciaries.

*Id.* at 96. The court specifically found that a bank does not become an ERISA fiduciary because it improperly converts assets of a plan (or because it has the ability to do so), reasoning that it was not the intent of Congress to permit federal jurisdiction under ERISA "whenever an incursion of an [ERISA] fund of any sort—by theft or by misappropriation, for example occurred." *Id.* at 97. *See also, Calhoun v. FDIC*, 653 F.Supp. 1288 (N.D.Tex.1987); *Robbins v. First American Bank of Virginia*, 514 F.Supp. 1183 (N.D.Ill.1981); *Donovan v. Cunningham*, 716 F.2d 1455, 1475 (5th Cir. 1983) *cert. denied*, 467 U.S. 1251, 104 S.Ct. 3533, 82 L.Ed.2d 839 (1984); *Bradshaw v. Jenkins*, 5 EBC 2754, 2760 (W.D.Wash. 1984); *Brandt v. Grounds*, 687 F.2d 895 (7th Cir.1982); and *Hibernia Bank v. Int'l Brotherhood of Teamsters*, 411 F.Supp. 478 (N.D.Cal.1976). Plaintiff has failed to present any authority from this circuit or elsewhere, conferring fiduciary status, pursuant to ERISA, upon a bank that has a commercial lending relationship with an ERISA plan.

Thus, the DOL opinions and applicable case law consistently support the position that a bank, which has no authority to manage or invest plan assets, but merely has possession of plan assets in the context of a depository, custodial, or borrower-lender relationship, is not an ERISA fiduciary. Moreover, a bank exercising its contractual and statutory rights vis-a-vis a plan borrower in a commercial lending relationship does not become a fiduciary of the borrower.[10]

---

9. Department of Labor ("DOL") opinions fully support the case law and state that a bank participating in an arms-length commercial transaction with an ERISA plan will not be considered a plan fiduciary or a party in interest. *See* DOL Opinion No. 79–10A (Feb. 12, 1979); DOL Opinion No. 82–049A (Sept. 21, 1982). DOL opinions should be afforded great deference in ERISA cases. *Bradshaw v. Jenkins*, 5 EBC 2754, 2759, fn. 3 (W.D.Wash.1984).

10. This view conforms to another line of authority holding that an entity which exercises discretionary authority or control over plan assets will not be considered a fiduciary under ERISA, if that discretion is limited by a pre-existing framework of policies, practices and procedures. *Gelardi v. Pertec Computer Corp.*, 761 F.2d 1323, 1325 (9th Cir.1985); *Munoz v. Prudential Insurance Co.*, 633 F.Supp. 564, 568 (D.Colo.1986); 29 C.F.R. § 2509.75–8 D–2.

13. The terms of the Loan transaction [11] did not confer fiduciary status on Sun Bank, but only afforded the Bank, in accordance with the commercial relationship embodied in the Loan agreement and the Uniform Commercial Code, the limited right to obtain additional collateral if the value of the stock pledged to secure the loan dropped below the margin requirement and the ability to declare a default and liquidate the collateral on commercially reasonable terms if the provisions of the Loan agreement were breached.[12] Sun Bank had no decision making authority or discretion whatsoever with regard to any aspect of the management, investment or disposition of plan assets. Sun Bank was merely a secured commercial lender that made a loan to a plan, who was entitled to exercise rights and remedies against the plan as borrower, under the terms of the Loan agreement and pursuant to Florida law.

14. There is no material fact contained in the record that Sun Bank, in its dealings with the Plan, exceeded its contractual and statutory rights as a lender. The undisputed facts show that Sun Bank acted with respect to the Plan only within the established framework of the transaction and the law and often—as a result of arm's length negotiations upon the request of

officials of the Plan and Air Florida—forbore on its rights to the benefit of the Plan.[13] There is no evidence to show that Sun Bank's relationship to the Plan included the discretionary, advisory activities described by ERISA. To adopt plaintiff's view would make it impossible for providers of goods and services (i) to enter into contractual relationships with ERISA plans without becoming fiduciaries and (ii) upon becoming fiduciaries would make it impossible for them to exercise their contractual rights without violating ERISA.

15. With regard to Greenberg, Traurig, to determine whether it is an ERISA fiduciary, the Court must examine whether the law firm engaged in any activities that fall within the functional definition of a fiduciary. *Yeseta v. Baima,* 837 F.2d 380 (9th Cir.1988). An attorney who renders legal services or advice to a plan, but does not engage in any fiduciary activities is not a fiduciary under ERISA. 29 C.F.R. § 2509.75–5 (1984).

16. Cases holding that a professional service provider is a fiduciary because he performed fiduciary functions uniformly involve factual situations where the service provider exercised broad authority or control over the plan assets. *See* generally, *Blatt v. Marshall and Lassman,* 812 F.2d

**11.** The terms of the Loan transaction included (1) that Sun Bank would possess the collateral, (2) that in addition to the shares of stock purchased, the Loan was secured by 40,000 shares of common stock previously owned by the Plan, (3) that the Promissory Note was a recourse note, (4) that Sun Bank was given blank stock powers and S–16 registration rights, (5) that the Note contained an insecurity and additional collateral provisions, and (6) that the parties would be governed by a 70% margin requirement.

**12.** The UCC and Florida case law specifically limit a creditor's ability to exercise any discretion or control over pledged collateral outside the framework of a negotiated loan agreement and the UCC. If a secured creditor fails to conform to the mandates of the UCC or acts with misfeasance or malfeasance with regard to the collateral or the debtor, a debtor is provided with remedies under the UCC. *See e.g.* Fla.Stat. § 679.507. Also, under Florida common law, claims such as conversion or negligence may be available for wrongful exercise of dominion and control by a secured party. *See e.g., Gartner v. Atlantic Nat'l Bank of Jacksonville,* 350 So.2d 495 (Fla. 1st DCA 1977), *cert. denied,* 367 So.2d

1122 (Fla.1979). These available remedies demonstrate that a secured creditor does not have discretionary authority or control over a borrower's assets.

**13.** Assuming *arguendo* that a bank did exceed its bargained for rights as set forth in a loan transaction and as established by Florida law, case law indicates that a bank would nevertheless not become an ERISA fiduciary. Thus, even though the bank in *O'Toole v. Arlington Trust Co.* took plan assets without the authority of the plan trustee to offset an obligation of the plan's sponsor, the bank was not considered to be a plan fiduciary. *O'Toole v. Arlington Trust Co.,* 681 F.2d 94 (1st Cir.1982). Moreover, in *Brandt v. Grounds,* 687 F.2d 895 (7th Cir.1982) a bank that wrongfully disbursed plan assets upon the presentation of forged documents was held not to be an ERISA fiduciary. *See also Nieto v. Ecker,* 845 F.2d 868, 871 (9th Cir.1988) (A party contracting with a plan does not become a plan fiduciary because services were performed negligently or dishonestly.)

810 (2d Cir.1987) (accounting firm principals were fiduciaries under ERISA by their exercise of actual control over disposition of plan assets); *Stanton v. Shearson Lehman/American Express, Inc.*, 631 F.Supp. 100 (N.D.Ga.1986) (stock brokerage firm could be fiduciary). In cases involving a law firm's liability under ERISA, courts have either held that a lawyer is not a fiduciary, *e.g., Yeseta v. Baima*, 837 F.2d 380 (9th Cir.1988), or proceeded directly to consider liability as a non-fiduciary, believing it to be obvious under the statute that a lawyer is not an ERISA fiduciary.

17. The undisputed facts demonstrate that Greenberg, Traurig did not perform any fiduciary functions. Defendant, Greenberg, Traurig was independent outside counsel to the Plan and merely rendered legal services to the Plan on an as-requested basis. These services consisted of drafting legal documents, interpreting laws, and rendering legal advice to a client.

18. Accordingly, as a matter of law, Sun Bank and Greenberg, Traurig cannot be considered fiduciaries to the Plan, and summary judgment is entered on behalf of Sun Bank and Greenberg, Traurig and against plaintiff.

C. *Claims for Non–Fiduciary Liability Under ERISA*

19. Recent case law suggests that ERISA does not provide a cause of action against non-fiduciaries, non-parties in interest, for alleged participation in a fiduciary's breach of duty. *See e.g., Massachusetts Mutual Life Insurance Co. v. Russell*, 473 U.S. 134, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985); *Nieto v. Ecker*, 845 F.2d 868, 871–874 (9th Cir.1988).[14]

20. ERISA expressly provides various causes of action against fiduciaries who breach their duties to a plan, but contains no express cause of action against non-fiduciaries who participate in a breach of duty by a plan fiduciary. There are cases that support an implied cause of action against non-fiduciaries under ERISA.[15] However, in 1985 the Supreme Court, citing *Cort v. Ash*, 422 U.S. 66, 68, 95 S.Ct. 2080, 2083, 45 L.Ed.2d 26 (1975), clearly indicated that causes of action not expressly provided for in ERISA should not be implied absent strong evidence that to do so would be consistent with the legislative intent and the statutory scheme of ERISA. *Massachusetts Mutual Life Insurance Co. v. Russell*, 473 U.S. 134, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985). In *Russell*, the Court stated:

> The six carefully-integrated civil enforcement provisions found in § 502(a) of the statute as finally enacted, however, provide strong evidence that Congress did not intend to authorize other remedies that it simply forgot to incorporate expressly. The assumption of inadvertent omission is rendered especially suspect upon close consideration of ERISA's interlocking, interrelated, and interdependent remedial scheme, which is in turn part of a "comprehensive and reticulated statute."

*Id.* at 146, 105 S.Ct. at 3092, citation omitted. The only appellate court to address the issue of non-fiduciary liability in light of *Russell*, held that no such cause of action may be implied. *Nieto v. Ecker*, 845 F.2d 868, 871–874 (9th Cir.1988); *See also, Southern California Meat Cutters Unions and Food Employers Pension Trust Fund v. Investors Research Co.*, 687 F.Supp. 506 (C.D.Cal.1988).[16]

21. Independently, even if there is a cause of action for non-fiduciary liability

---

**14.** ERISA, however, does appear to provide certain remedies against non-fiduciaries who are parties in interest who participate in a prohibited transaction with a plan, as party in interest behavior, as opposed to that of a non-fiduciary, non-party in interest, is regulated by ERISA. *See Nieto v. Ecker*, 845 F.2d at 873–874.

**15.** *See e.g. Thornton v. Evans*, 692 F.2d 1064, 1078 (7th Cir.1982).

**16.** Four other courts of appeals have addressed the issue of non-fiduciary liability since *Russell*. None have considered the impact of *Russell*, and three of the four apparently involve liability of parties in interest. *Brock v. Hendershott*, 840 F.2d 339 (6th Cir.1988); *Fink v. National Savings & Trust Co.*, 772 F.2d 951 (D.C.Cir.1985); *Lowen v. Tower Asset Mgmt. Inc.*, 829 F.2d 1209 (2d Cir.1987); *Whitfield v. Lindemann*, 853 F.2d 1298 (5th Cir.1988).

under 29 U.S.C. § 1132(a)(3) the record is devoid of evidence indicating that either Sun Bank or Greenberg, Traurig knowingly participated in any breach of fiduciary duty owed by the plan fiduciaries.

22. Under ERISA case law decided without the benefit of a review or consideration of *Massachusetts Mutual Life Insurance Co. v. Russell,* and *Nieto v. Ecker, supra,* to prove that a non-fiduciary participated in a breach of fiduciary duty, one must show (1) an act or omission which furthers or completes the breach of trust by the trustee and (2) knowledge at the time of the transaction that it amounted to a breach of trust. *Freund v. Marshall & Ilsley Bank,* 485 F.Supp. 629, 642 (W.D. Wis.1979).

23. As to the Bank, plaintiff claims that the May 11, 1981 memorandum shows that Sun Bank knew that the initial loan was illegal, and that Sun Bank knew that the guarantees given by Air Florida to secure the Plan's debt were prohibited transactions under ERISA. Moreover, plaintiff attempts to allege that Sun Bank was a non-fiduciary participating in fiduciary breaches as a result of the provision of additional collateral, the reduction of principal and the Loan redocumentation.[17]

24. The record, however, is clear that Sun Bank had no knowledge of fiduciary breaches and many of the fiduciary breaches alleged are not breaches at all. With regard to the May 11th memorandum, plaintiff has conceded that Sun Bank believed, based on a legal opinion obtained from Greenberg, Traurig, that the Plan could legally borrow and pledge assets to secure the borrowing. Moreover, neither the acceptance of a guaranty, the pledge of additional collateral, the principal reduction, nor the Loan redocumentation, show that Sun Bank knowingly participated in a breach of fiduciary duty. These facts show only that Sun Bank and the Plan acted as borrower and lender in an arms-length transaction. Plaintiff has failed to come forward with any material fact which shows that defendant, Sun Bank, knew of

any violation of ERISA, if such violations indeed occurred.

25. As to Greenberg, Traurig, the cases involving attorneys who knowingly participated in a breach of trust by an ERISA fiduciary involve facts clearly distinguishable from those of the instant case. The cases typically involve an attorney who went beyond the scope of merely rendering legal services, and was actually part of a conspiracy or fraud with Plan fiduciaries in violation of ERISA. *See, e.g., Thornton v. Evans,* 692 F.2d 1064 (7th Cir.1982) (attorney allegedly conspired with others to defraud the fund, made fraudulent representations to the Director of the Arizona Insurance Department, made knowing misrepresentations regarding the status of a bank account, held meetings in his office in furtherance of the conspiracy, and had letters relating to the conspiracy drafted in his office and typed by his secretary); *Donovan v. Daugherty,* 550 F.Supp. 390 (S.D.Ala.1982) (plaintiff alleged that the plan's attorney knowingly participated in, and was personally enriched by a decision by the plan's trustees to extend coverage to him as a participant in the plan, and to pay him benefits from the plan); *Donovan v. Unicorn Group,* 3 EBC 1665 (S.D.N.Y. 1982) (plaintiff alleged the attorneys for the fund knowingly participated in and profited from breaches of the investment managers of the fund who imprudently made loans and received kick-backs in connection with the loan). The facts of these cases are distinguishable from the very limited involvement of defendant, Greenberg, Traurig, as independent outside counsel to the Plan, which rendered legal services to the Plan on an as-requested basis. Plaintiff has adduced no evidence of Greenberg, Traurig's knowing participation in a conspiracy or fraud with Plan fiduciaries in a breach of fiduciary trust, or personal enrichment. Plaintiff has failed to adduce any facts which indicate that defendant, Greenberg, Traurig, knew of any violations of ERISA at the time such transactions allegedly occurred.

---

17. *See* footnote 6, *supra.*

26. Accordingly, the plaintiff has adduced no facts to establish that Sun Bank and Greenberg, Traurig knowingly participated in a fiduciary's breach of duty, and as a matter of law, summary judgment is entered on behalf of Sun Bank and Greenberg, Traurig and against the plaintiff.

### D. *Claim for Punitive Damages*

27. This Court holds that punitive damages are not awardable to the plaintiff as a matter of law. *Massachusetts Mutual Life Insurance Company v. Russell*, 473 U.S. 134, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985); *Bishop v. Osborn Transportation, Inc.*, 838 F.2d 1173 (11th Cir.1988); *Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan Enterprises, Inc.*, 793 F.2d 1456 *rehearing denied*, 797 F.2d 977 (5th Cir.1986), *cert. denied*, 479 U.S. 1034, 107 S.Ct. 884, 93 L.Ed.2d 837 (1987); *Sokol v. Bernstein*, 803 F.2d 532 (9th Cir.1986); *Foltz v. U.S. News & World Report, Inc.*, 627 F.Supp. 1143 (D.C.Cir. 1986); *Powell v. Chesapeake & Potomac Telephone Co. of Virginia*, 780 F.2d 419 (4th Cir.1985) *cert. denied*, 476 U.S. 1170, 106 S.Ct. 2892, 90 L.Ed.2d 980 (1986); *Varhola v. Doe*, 820 F.2d 809 (6th Cir.1987).

28. Moreover, as a matter of law, no fact in this case warrants the imposition of punitive damages.

29. Accordingly, plaintiff's claim for punitive damages against Timoner, Alvarez, Campbell, Kimberly and Sun Bank is dismissed.

### E. *Late Filed Supplement to Local Rule 10 J Statement, Affidavit and Motion for Continuance or Extension of Time for Filing Affidavits*

30. Plaintiff's supplement to 10 J statements of material and disputed facts directed to defendants, Alvarez, Lloyd–Jones, Sun Bank, Timoner and Greenberg, Traurig, served at the hearing on the motions for summary judgment on December 15, 1988, is hereby stricken as it was not served within the time frame established by Local Rule 10 J(2). *Clinkscales v. Chevron USA, Inc.*, 831 F.2d 1565 (11th Cir.1987).

31. The affidavit of Donald Lloyd–Jones served by the plaintiff on defendant, Greenberg, Traurig on December 15, 1988, is stricken as it was untimely and its submission would prejudice the defendants. *Clinkscales v. Chevron USA, Inc.*, 831 F.2d 1565 (11th Cir.1987).[18]

32. For the reasons stated above, plaintiff's motion for continuance or extension of time for filing affidavits served at 5:00 p.m. on December 15, 1988, is denied. *See Jones v. Darin & Armstrong, Inc.*, 785 F.2d 1521 (11th Cir.1986).

### F. *Plaintiff's Motion for Partial Summary Judgment and Sanders Campbell's Motion for Summary Judgment*

33. Plaintiff's motion for partial summary judgment as to defendants, Sun Bank and Greenberg, Traurig, for the reasons set forth above, is denied.

34. Plaintiff's motion for partial summary judgment as to defendants, Timoner, Alvarez, Campbell and Kimberly is hereby denied as there are issues of fact which remain to be adjudicated, which precludes the entry of summary judgment.[19]

35. Defendant, Sanders Campbell's motion for summary final judgment, served on November 24, 1987 is hereby denied, as the plaintiff has come forward with sufficient evidence that requires a determination by a finder of fact.

---

**18.** At the hearing on December 15, 1988, this Court was advised that defendant, Donald Lloyd–Jones and the plaintiff entered into a settlement agreement regarding the issues involved in this litigation.

**19.** Although defendant Alvarez's motion for partial summary judgment raised only the punitive damage issue, for the reasons set forth above in the discussion of plaintiff's claims against Greenberg, Traurig, Plaintiff's claims against defendant Alvarez are also not supportable to the extent, that they involve Alvarez's tenure at Greenberg, Traurig. Therefore, the claims that remain against Alvarez are limited to the period of time that Alvarez was a full-time employee of Air Florida.

### G. *Statute of Limitations*

36. The Court reserves ruling on the issue of the statute of limitations. The Court will postpone setting a trial date for the trial involving defendants, Timoner, Alvarez, Campbell and Kimberly pending the resolution of the issue of the statute of limitations.

37. Any of the foregoing conclusions of law which constitute findings of fact are hereby adopted by the Court as findings of fact.

DONE AND ORDERED.